MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Plaintiffs,

v.

C. W. BOCOCK, III, Individually and as Trustee for Charles William Bocock, IV and Robert James Bocock, Defendants and Third-Party Plaintiffs,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., and Charles D. Pearce, Third-Party Defendants.

Civ. A. No. 13426.

United States District Court
S. D. Texas,
Houston Division.

Aug. 18, 1965.

**374**

Baker, Botts, Shepherd & Coates, William C. Harvin and Ralph S. Carrigan, Houston, Tex., for plaintiffs and third-party defendants.

R. Richard Roberts, Jack H. Reeves, and Otto A. Yelton, Jr., Houston, Tex., for defendants and third-party plaintiffs.

Saccomanno, Clegg, Martin & Pinedo, Frank M. Pinedo, Houston, Tex., for third-party defendant Pearce.

HANNAY, District Judge.

This is a suit filed by Merrill Lynch, Pierce, Fenner & Smith, Inc., a Delaware corporation, having its principal office in New York City, N. Y., against C. W. Bocock, III, Individually, of Houston, Texas, and also as Trustee for Charles William Bocock, IV and Robert James Bocock on sworn account or alternatively, for money due. The Defendants filed a cross action herein against Merrill Lynch and one of its then Account Executives, Charles D. Pearce, Jr., also of Houston, Texas.

For cause of action Merrill Lynch alleges that as a result of a short sale Defendant C. W. Bocock, III owes Merrill Lynch a balance of $13,229.07, together with interest thereon from December 14, 1959, and that Charles W. Bocock, III, Individually and as Trustee for his minor children, Charles William Bocock, IV and Robert James Bocock, owes Merrill Lynch the sum of $15,013.73, together with interest thereon from December 14, 1959. A short sale is accomplished by borrowing stock from the owner and selling it. The short seller hopes to profit by buying an equivalent number of shares later at a lower price and returning these to the lender.

Thereafter the Defendants answer and set forth at great length the transactions between the Plaintiff and Charles D. Pearce, the Third Party Defendant, and pray for judgment against the Third Party Defendants, individually, jointly and severally, in the sum of $188,182.28, on behalf of C. W. Bocock, III, Individually, and in the sum of $64,000.00 on behalf of C. W. Bocock, III, Trustee, with legal interest.

The case was tried by the Court without a jury.

The questions for decision are:

1. Whether Bocock, III, Individually, is entitled to any recovery for fraud or negligence on the part of Third Party Defendants by reason of the short sale transaction?

2. Whether or not, if there had been any wrongful acts on the part of Third Party Defendants, Bocock's actions preclude liability against Merrill Lynch and/or Pearce by reason of ratification, estoppel or waiver?

3. Whether or not Bocock, III as Trustee was authorized to use trust funds in a short sale?

4. Whether as a result of the short sale transaction Merrill Lynch and/or Pearce, in the event that they have to pay to Bocock, Trustee, the money lost in the short sale transaction, are entitled to indemnity from Bocock, Individually?

At the time of the short sale C. W. Bocock, III was 42 years of age. He was a high school graduate. He had worked for about two years with The Texas Company in a seismograph crew. He then organized his own company which he operated first as an individual, then as a partnership, and at the time of the sale to the Clevite Corporation, it was a corporation by the name of Technical Instruments Company. Technical Instruments Company manufactured and repaired technical instruments. At one

time it employed as many as 150 persons and had gross sales of about $500,000.00 per year. Bocock was its president and chief stockholder. The balance of the stock was owned by his wife, his mother, and his father-in-law.

In February, 1955, some of the assets of the company (not including real estate) was sold to the Brush Electronics Division, a subsidiary of the Clevite Corporation of Cleveland, Ohio. The sale price was approximately $750,000.00 which was paid in 7500 shares of Clevite common stock and 1500 shares of Clevite preferred stock, plus $470,000.00 in cash, plus an amount allowed for the payment for certain unpaid normal liabilities.

Bocock first opened an account with Merrill Lynch on March 10, 1955, by the purchase of 100 shares of Clevite. Pearce was the Account Executive that handled Bocock's transactions. In July, 1957, Bocock sold 200 shares of Clevite and then a few days later 700 shares of Clevite. On July 19, 1957, Bocock sold 700 shares of Clevite that he was holding as trustee for the stockholders of Technical Instruments Company. The 7500 shares sold by Bocock was at the peak price for 1957. In October, 1957, Bocock purchased 7500 shares of Clevite personally and 2500 shares for his sons for whom he was Trustee under a Trust Agreement. When the price of Clevite dropped to $20.00 per share, Pearce asked Bocock why he had not sold short. Bocock answered that he did not understand short selling. Pearce was a man of some 64 years of age at that time and, except for a short period of time in World War II, had spent all of his adult life in the brokerage business. He was a man of strong convictions which he expressed in positive language. He had supreme confidence in his own judgment in matters pertaining to the stock market. He was extremely proud of his many years in that business. Although Pearce and Bocock had a number of discussions concerning short sales, Bocock was not convinced that it was the proper action for him to take to sell short. Pearce on that question was consistent and persistent in his advice for Bocock to do so.

Bocock, after the sale to Clevite's subsidiary, continued for more than a year as an employee of that company in Houston, Texas, in an executive capacity. Before the short sale, he attended at least two stockholders' meetings of Clevite. He became convinced that because Clevite had paid him what he considered greatly in excess of what the assets that he sold to them were worth, and that there was dissension among the major executives of the corporation, and because of the loss of an important contract with the Chrysler Corporation, that the Clevite company would not prosper. This opinion and the reasons therefor he communicated to Pearce.

On or about December 9, 1958, Bocock, who himself was a subscriber to and regular reader of The Wall Street Journal and U. S. News & World Report, and who also noted the movement of Clevite through the daily papers, came to the office of Merrill Lynch with his long-time attorney, Jack Reeves. They there discussed with Pearce the advisability of entering into a short sale transaction on Clevite. Pearce strongly urged that it be done. Reeves asked two questions of Pearce: first, could Bocock take a long-term capital gain from the transaction, to which Pearce replied that he could not; and second, would Bocock be liable for dividends paid by Clevite during the short sale transaction. Pearce informed him that he would be. Reeves then advised Bocock that it would be inadvisable for him to engage in the short term transaction. Reeves then left the offices of Merrill Lynch. Bocock told Pearce of Reeves' advice, to which Pearce, in effect, replied: "You should take your lawyer's advice on legal matters, but your broker's advice (meaning himself) on stock matters." Thereupon, on that same date, Bocock executed marginal lending agreements in the following accounts:

1. Charles W. Bocock, III, Account No. 582–44425—his individual account.

(Plaintiff's Exhibit 5).

2. C. W. Bocock, III, Trustee, Account No. 582–15326—his trust account.

(Plaintiff's Exhibit 6).

Thereafter, Bocock sold 7500 shares of Clevite common stock in his individual account and 2500 shares of stock in the trust account of his two sons. At that time, although Bocock put up the 90% necessary, it being a marginal account, Bocock claims that Pearce told him that if he put up 100% of the value of the stock at the time that he would not have to put up any further money. This Pearce denies.

The Court is of the opinion that Pearce did not tell Bocock that a short sale was limitless in amount and did not suggest to him that if he only wanted to protect against a five point advance in the stock that he should place an order to that effect with Merrill Lynch. Both of these facts should have been told by Pearce to Bocock.

During most of the year 1959 Bocock maintained the short position in the above described accounts. On December 9, 1959, Merrill Lynch sent formal written maintenance calls in the amount of $46,675.00 in his individual account and $33,850.00 in his trust account. Bocock declined to meet this demand for additional margin and he was on December 9, 1959, advised by telegram that Merrill Lynch would take whatever action it deemed necessary for its protection. Bocock again declined to take any action. Accordingly, Merrill Lynch did purchase on the New York Stock Exchange 8100 shares of Clevite to cover Bocock's position. This Merrill Lynch claims that it had the authorization to do under the marginal lending agreements of December 9, 1958. (See Plaintiff's Exhibit 6).

Request was duly made · by Merrill Lynch of Bocock for the payment of the balances claimed due in his individual and trust ·accounts. Such payment was by Bocock refused.

Soon after Bocock discontinued his services with Clevite Corporation, he moved from Houston to Hunt, Texas, a distance of about 310 miles. He had a telephone and received mail there regularly. He frequently communicated both by phone and through the mails with Pearce on the subject of his stock transactions. Bocock at that time had previously purchased a number of stocks and bonds that were in value in excess of $200,000.00. This Pearce did not know. Also, he still maintained the Clevite preferred stock worth about $150,000.00. Bocock also was a director of the Highland Village State Bank and of the Southwestern Savings Association, both of Houston, Texas.

Bocock strongly urges, as a reason for recovery against Merrill Lynch and Pearce, that he was an unsophisticated, naive investor and was talked into the short sale which ended so disastrously for him by Pearce. Undoubtedly, but for Pearce's urging, the short sale would not have been undertaken. In addition to the matters pointed out by Reeves after his conference with Pearce described above, Pearce, knowing the hazardous nature of a short sale and of the fact that the loss without an order for sale could be limitless, when the price advanced, should have explained these objections to Bocock. This he did not do. However, on the other hand, Bocock had demonstrated his financial acumen in the formation and successful management of his own company, of his sale, and of two previous profitable transactions involving Clevite stock sales, which was in one instance at least in the amount of 10,000 shares, and by his purchase of other stocks and bonds and real estate, and that he was a suitable person and a prudent one in which to make a transaction of the size of the short sale.

The Court therefore holds that there was no fraud on the part of either Merrill Lynch or Pearce in the procurement of the short sale by Bocock, Individually. The reason for this holding is, considering Bocock's age, education, intelligence, business experience and familiarity with stock transactions, particularly in recent successful deals involving Clevite stock

in similarly large amounts, and the Court concludes, that Bocock, Individually, was a "suitable person" considering his other security holdings and his financial situation and needs. See Section 2 of Article 3 of the Bylaws of the National Association of Security Dealers.

Had any inaccurate statements or representations been made by Pearce to Bocock before the signing of the short sale or margin agreements since such, if any, were not embodied in the contract itself, it is presumed that all oral negotiations were merged in the written instruments and cannot later be contradicted. See Grimsley v. Life Insurance Company of Virginia, Tex.Civ.App., 154 S.W.2d 196 (1941, writ ref. w. m.).

Since the contract pertaining to Bocock, Individually, was not induced by fraud, the case of Dallas Farm Machinery Co. v. Reaves, 158 Tex. 1, 307 S.W.2d 233 does not apply.

As to negligence, the Court is of the opinion that, considering all the facts and factors, as far as the individual account of Bocock is concerned, that neither Merrill Lynch nor Pearce is guilty of actionable negligence. Consequently, the answer to the first question, that is, whether Bocock, III is individually entitled to recover for fraud or negligence on the part of Merrill Lynch and/or Pearce by reason of the short sale transaction is no.

Considering now the second question for decision, that is, whether Bocock's actions preclude an assertion of liability against Merrill Lynch and/or Pearce by reason of ratification, estoppel or waiver. Bocock entered into the stock sale agreement on December 9, 1958. Approximately eleven months thereafter, he first attempted to disaffirm or repudiate that transaction, then the market had taken a complete turn against him. During the eleven months period, he received confirmation slips, monthly statements and had verified auditors' reports. He placed other orders in Clevite stock with Merrill Lynch. He received statements from his account for the payment of short dividends. Never during that time did he place Merrill Lynch on notice that he was disaffirming this individual transaction. Meyer, The Law of Stockbrokers and Stock Exchanges, (1931), in dealing with the necessity for timely repudiation, states at pages 416–17, as follows:

"A customer who wishes to repudiate an act of his broker must do so with reasonable promptness. How much time may be taken for this purpose is not established by any fixed rule. It has been held in some cases that the disaffirmance must be made within a reasonable time; in others it must be made promptly; in still others, that it must be made immediately. It is clear, however, from the decisions that the customer may not delay very long after the wrongful act has been brought to his knowledge."

To the same effect see Carr v. Warner, 137 F.Supp. 611 (1955); Nash v. J. Arthur Warner & Company, 137 F.Supp. 615 (1955); Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (CCA 9, 1962); and James Wood General Trading Establishment v. Jacques Coe & Co., 297 F.2d 651 (CCA 2, 1961).

■■ In the Royal Air Properties, Inc. v. Smith, supra, it was well said: "The purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act." Cases cited including Goldenberg v. Bache and Company, 270 F.2d 675, 681 (5 Cir., 1959). In the James Wood General Trading Establishment v. Coe & Co. case, 297 F.2d at page 659, the court held, in effect, that it is the common custom of the trade to send a confirmation of that kind of an order the very day and every month thereafter.

In the Nash case, supra, Judge Wyzanski held in substance that investors who repeatedly accepted confirmations and accounts and failed to seasonably make complaints were barred by late assertion of any wrong alleged to have been done by the brokerage company.

Bocock's answer to the question of ratification, estoppel or waiver, is simply that the cases above referred to are not applicable. To this the Court does not agree. The Court does not consider the failure to object within the eleven months period to be reasonable and is of the opinion and holds that by his failure within a reasonable time to disaffirm Bocock ratified, waived and is estopped from assertion of liability against either Merrill Lynch or Pearce with regard to his individual account. It necessarily follows that the answer to the second question is yes, since the alleged wrongful acts on the part of Third Party Defendants were ratified, estopped, or waived by Bocock's failure to timely disaffirm. It further means that Bocock, Individually, is liable for the amount of $13,229.07 that he is sued for by Merrill Lynch, together with interest thereon from December 14, 1959, and that Bocock, Individually, is not entitled to recover from either Merrill Lynch or Pearce.

Turning now to the question of whether or not Bocock, III as Trustee was authorized to use trust funds of his minor children in a short stock sale. On August 19, 1953, Bocock's father-in-law and mother-in-law established a trust for the benefit of Bocock's two minor sons with Bocock named as Trustee. This trust was drawn by a competent Houston lawyer selected by the Trustors and not the Trustee. On July 30, 1957, when Bocock opened a second account as Trustee for his two sons with Merrill Lynch, he was asked by Pearce for a copy of the Trust Agreement. Bocock at that time claimed that he had authority under the trust "to do with the trust funds as he wanted to." This statement by Bocock was made in good faith, but he was in error. It was, in effect, a legal opinion on a complicated legal instrument by a layman. It did not mislead Pearce and was unintentionally wrong. However, Pearce did not accept or rely on Bocock's assertion but insisted upon and was given a copy of the Trust Agreement which was submitted to the New Accounts Department of Merrill Lynch.

Messrs. Skutch and Burton, New York attorneys for Merrill Lynch, not their Houston attorneys, in reply to an inquiry, wrote the Houston office of Merrill Lynch and authorized the carrying of a cash account for the purchase and sale of securities. Accordingly, the cash account was opened and approved. The copy of the Trust Agreement was retained by Merrill Lynch. Pearce claims that he did not know the result of the inquiry as to the Trustee's authority under the Trust Agreement and that he did not communicate Merrill Lynch attorneys' opinion to Bocock. Everything considered, Pearce should have followed up the inquiry as to the authorization of the Trustee under the Trust Agreement and should have relayed that opinion to Bocock. Grubbs should have made known to Pearce the result of the inquiry. This failure shows lack of coordination and cooperation between Grubbs and Pearce. When Bocock furnished the copy of the Trust Agreement to Merrill Lynch, the question of reliance upon his statement ceased. From that time on Merrill Lynch acted, or should have acted, upon the opinion of their legal department.

Bocock was not the proximate cause of the loss of trust funds. The failure of Pearce to learn the result of the legal opinion of Merrill Lynch and to communicate that to Bocock was a proximate cause of the loss of the trust funds involved in the short sale.

Grubbs, as Office Manager of the Houston office of Merrill Lynch, had passed over his desk daily the sales. He did not discover the short sale involving Trustee's funds as he should have. Or if he did, he did not take appropriate action thereon. From December 9, 1958 on, Merrill Lynch sent confirmation notices and monthly statements showing the short sale status by Bocock, Trustee. This was or should have been known by Grubbs. In fact, from the very first transaction of Bocock as Trustee, Grubbs should have known and having had notice, should have stopped the use by the Trus-

tee of funds in a short sale transaction. Grubbs should have then made inquiry of the legal department as to whether the trust funds could be legally used for speculative purposes, which a margin transaction is and, of course, a short sale is a margin transaction. Grubbs' failure to do so was a proximate cause of the loss of the trust funds.

In Texas it is enlightening to check the Probate Code with reference to what investments can properly and legally be made by a guardian of the estate of a minor. See Vernon's Civil Statutes of the State of Texas, Probate Code, Section 389, V.A.T.S. This article does not authorize speculative or margin accounts of minors to be invested by the guardian. A margin account and a short sale are speculative to the extent that they can be termed "rank gambles."

On page 41 of Merrill Lynch's Reply Brief, it is admitted:

"The Texas Trust Act does not grant to Bocock or any other trustee the power to engage in margin transactions."

When the short sales of Bocock, both in his individual account and his trust account, came to the point when further funds were demanded, Grubbs again contacted Skutch and Burton who then wrote him: "In our opinion, the Trust Indenture does *not* authorize the Trustee to engage in *margin* transactions." (Emphasis added.)

At this point it is well to define what is meant, respectively, by the word "invest" and the word "speculate." "Invest" means the placing of capital or the laying out of money in a way intended to secure income or profit and to so place it that it will be *safe* and yield a profit. The word "speculate" is one outside of the range of ordinary buying and selling and involves the elements of risk and uncertainty dependent on the fluctuations in the market more or less remote in time and in which no means exist to ascertain, even approximately, the probable result. It is not safe.

In Neblett v. Valentino, Tex.Civ.App., 55 S.W.2d 875; 127 Tex. 279, 92 S.W.2d 432, it was held that where a trustee was entrusted with funds for the protection of a minor and inadvisedly used practically all the funds to purchase a vacant, non-revenue producing city lot which became encumbered by tax liens, then such transaction was not a proper use of trust funds.

In the case of First Nat. Bank of St. Petersburg v. Solomon, 5 Cir., 63 F.2d 900, at page 901, in which Judge Hutcheson wrote well for a strong panel of the Fifth Circuit (consisting of Hutcheson, Sibley and Bryan), as follows:

"On the merits, appellee insists that, wholly apart from questions of good faith and good judgment, the decree is right, for the peremptory reason that trust moneys may not, in the absence of a special agreement therefor, be invested in second mortgage bonds, while appellant insists that, absent controlling Florida statutes or decisions, and neither statute nor decision prohibiting such purchase is cited, the purchase of second mortgage bonds was not a violation per se of the trust. The case made does not require the broad issue thus presented to be decided. We shall not decide or discuss it further than to say that, generally speaking, safety is the first consideration in the investment of trust funds, and, because this is so, they may not be invested in speculative securities, and that second mortgages are generally so regarded. 17 Am. & Eng. Ency. of Law, p. 448; Loring, a Trustee's Handbook, p. 140; Mattocks v. Moulton, 84 Me. 545, 24 A. 1004; Porter v. Woodruff, 36 N.J.Eq. 174; Bogert on Trusts, p. 363; New Haven Trust Co. v. Doherty, 75 Conn. 555, 54 A. 209, 96 Am.St.Rep. 239."

In that case, as in instant case, *safety* should have been the first consideration, and this Court has been cited no Texas statutes or decisions that authorize the speculating in short sales or margin accounts with trust funds. In the Court's opinion, short sales are much,

much more of a dangerous speculation than second mortgages.

 It is inconceivable that Bocock would have attempted to use the funds of his minor sons had Pearce or anyone else connected with Merrill Lynch told him of the opinion of Merrill Lynch's counsel on that point which surely would have been the same at the time of the beginning of the transaction as it was at the time of their giving a second opinion on the Trust Agreement. This failure on the part of both Merrill Lynch and Pearce constituted primary, active, actionable and aggravated negligence.

It is small wonder that Grubbs expressed "alarm" when he learned that Pearce had not told Bocock that the trust funds could not be used for a short sale transaction. Merrill Lynch did not attempt to show any custom, in fact did not attempt to show a single instance where trustee's funds had ever in its long history been handled by them for a short sale transaction. It therefore follows that the answer to the third question is no, that Bocock, III as Trustee was not authorized as Trustee to use trust funds in a short sale.

 Lastly, on the fourth question as to whether or not Bocock, Individually, is liable to Merrill Lynch and/or Pearce as indemnity because of the money lost by the trust in the short sale transaction. As discussed in the last question, a short sale transaction is a margin account and as such is not an investment but is a speculation. This transaction should never have been made. Both Pearce and Merrill Lynch knew this. Pearce knew that Bocock was a novice as far as short sale transactions were concerned, and he also well knew that Bocock was not an attorney. Neither Merrill Lynch nor Pearce had the right to depend on any statement of Bocock as to the trust fund, and particularly so since he promptly furnished a complete copy of the Trust Agreement. Both Grubbs and Pearce, either or both, could have and should have vetoed the stock transactions involving trust funds at their very inception. Considering their long, varied and vast experience as brokers, it is inconceivable that they did not know of the prohibition of the use of the trust funds in a short sale transaction.

If Bocock was guilty of any negligence, it was passive. Both Pearce and Grubbs were guilty of active negligence. They were the real, primary wrongdoers and tort-feasors. This active negligence on their part, jointly and severally, was the direct and proximate cause of the loss of the trust funds. Had either Pearce or Grubbs used ordinary care, the transaction would never have taken place. See Vulcan Materials Co. v. Warlick, Tex. Civ.App., 375 S.W.2d 480, RNRE.

It therefore follows that the judgment of this Court is that Merrill Lynch recover from Bocock, Individually, the sum of $13,229.07, together with interest at the rate of 6% per annum from December 14, 1959, until paid; that Bocock, Individually, not recover from Merrill Lynch by reason of his individual short sale; that Merrill Lynch not recover any sum from Bocock, III as Trustee; that Bocock, III as Trustee recover from Merrill Lynch and Pearce, jointly and severally, the sum of $64,000.00, together with interest at the rate of 6% per annum on $20,300.00 thereof from January 2, 1959, and on $41,000.00 from January 9, 1959; that Merrill Lynch and Pearce are denied indemnity from Bocock, Individually, for the said $64,000.00 plus interest; and that the amount claimed by Merrill Lynch against Bocock, III as Trustee for the alleged deficiency by the trust fund in the short sale transaction is denied.

Court costs are adjudged 50% against Merrill Lynch and Pearce, jointly and severally, and 50% against Bocock, Individually.

This Court has jurisdiction over the subject matter and parties to this suit.

The above and foregoing constitutes the Court's findings of fact and conclusions of law in this case.

The Clerk will notify counsel.