Nancy H. OCRANT, Appellant,

v.

DEAN WITTER & COMPANY, INC., Appellee.

No. 74–1012.

United States Court of Appeals, Tenth Circuit.

Argued July 12, 1974.

Decided Sept. 18, 1974.

John W. McKendree, of Hemminger, McKendree, Vamos & Elliott, P. C., Denver, Colo., for appellant.

D. Monte Pascoe, Denver, Colo. (Ireland, Stapleton, Pryor & Holmes, P. C., and William G. Imig, Denver, Colo., with him on the brief), for appellee.

Before HILL, SETH and HOLLOWAY, Circuit Judges.

SETH, Circuit Judge.

Nancy H. Ocrant, the plaintiff, appeals from a directed verdict for the defendant in her action premised on allegedly unauthorized transactions in an account maintained in her name with the defendant brokerage house. Her complaint listed several theories upon which she sought to recover.

The plaintiff, during the period with which we are concerned, was married to Lawrence Ocrant, an active investor in the stock market and a licensed broker. He maintained several large accounts with the defendant Dean Witter's Denver office, all of which were managed by Lewis A. Waldbaum, an agent and vice president of the firm. Mr. Ocrant was a daily visitor to the Denver Dean Witter offices, and he and Mr. Waldbaum were close personal friends and their families were together on numerous social occasions. Throughout the period in question Mr. Ocrant actively directed the transactions in his accounts. He was a heavy trader, and the turnover in his accounts was rapid. Many of his securities were held for only a few days before being sold or traded.

On August 13, 1968, Mr. Waldbaum opened account number 68–16409 in the name of Nancy H. Ocrant. The account was ostensibly to be a nondiscretionary, nonmargin account, meaning that only Mrs. Ocrant or her designated attorney in fact could authorize transactions in the account. The subsequent handling of the account, however, belies this status. In contrast to her husband, Mrs. Ocrant was an unsophisticated investor with very little knowledge of the operation of the stock market. As a result she gave virtually no attention to the handling of her account and relied exclusively on her husband's judgment and expertise in this area. Thus, under her

husband's direction her account was managed in much the same fashion as the other Ocrant accounts, that is, with heavy trading and rapid turnover. Dean Witter, however, was unable to produce a power of attorney designating either Mr. Ocrant or Mr. Waldbaum with authority to make transactions from the account, and there was no testimony that one was ever executed.

Beginning in October 1969 Mr. Ocrant begin to acquire large blocks of Standard Oil of California shares in both his and his wife's accounts. Mrs. Ocrant does not challenge any of the transactions in her account prior to this point, but rather asserts that with the acquisition of the Standard of California shares the character of her account changed, and that it was her husband's intention to develop her account into a permanent source of income and security for her. Thus, while there is some conflict in the record on this matter, the plaintiff's position is that the Standard shares were being acquired as a permanent, blue-chip investment, and the heavy trading in the account was thereafter to cease. There is evidence in the record that this change in status was communicated to Mr. Waldbaum in a very general fashion during various social occasions, and the Standard shares were sometimes thereafter referred to as "Nancy's nest egg." As was characteristic of the Ocrant-Waldbaum business transactions, however, nothing was ever set forth in writing. In any event, between October 1969 and January 1970 some 14,400 shares of Standard Oil of California were purchased for Mrs. Ocrant's account.

The disputed transactions occurred in January and February 1970, and are shown in tabular form as follows:

| No. of Shares | Stock | Settlement Date | Purchased or Sold |
|---|---|---|---|
| 2800 | Standard Oil | Jan. 27 1970 | Sold |
| 1400 | Standard Oil | Jan. 27, 1970 | Sold |
| 900 | Standard Oil | Jan. 28, 1970 | Sold |
| 600 | Standard Oil | Jan. 30, 1970 | Sold |
| 300 | Standard Oil | Jan. 30, 1970 | Sold |
| 800 | Standard Oil | Jan. 30, 1970 | Sold |
| 1000 | Standard Oil | Feb. 4, 1970 | Sold |
| 600 | Standard Oil | Feb. 5, 1970 | Sold |
| 300 | Standard Oil | Feb. 17, 1970 | Sold |
| 1000 | Standard Oil | Feb. 17, 1970 | Sold |
| 4700 | Standard Oil | Feb. 18, 1970 | Sold |
| 2100 | Reading & Bates OD | Jan. 27, 1970 | Purchased |
| 500 | Reading & Bates OD | Jan. 27, 1970 | Purchased |
| 4000 | Reading & Bates OD | Jan. 27, 1970 | Purchased |
| 2300 | Reading & Bates OD | Feb. 19, 1970 | Purchased |
| 100 | Reading & Bates OD | Jan. 28, 1970 | Purchased |
| 1000 | Reading & Bates OD | Jan. 28, 1970 | Sold |
| 100 | Reading & Bates OD | Feb. 19, 1970 | Sold |
| 1400 | Reading & Bates OD | Feb. 24, 1970 | Sold |
| 100 | Reading & Bates OD | Feb. 24, 1970 | Sold |
| 2800 | Reading & Bates OD | Feb. 24, 1970 | Sold |
| 700 | Reading & Bates OD | Feb. 25, 1970 | Sold |
| 2900 | Reading & Bates OD | Feb. 25, 1970 | Sold |

The result was that between January 27 and February 18, 1970, all 14,400 shares of Standard Oil of California were sold from the account; 9,000 shares of Reading & Bates OD were acquired on January 27 and 28, 1970, and those shares were subsequently sold between January 19 and 25, 1970. All of these transactions, according to the plaintiff, were accomplished without her knowledge or authorization. There is some dispute in the record whether they were directed or authorized by Mr. Ocrant. It is undisputed, however, that Dean Witter in ac-

cordance with its routine procedures mailed transaction confirmation slips as well as monthly account statements to the plaintiff. Mrs. Ocrant acknowledges receipt of these, but maintains it was her practice simply to put such mail on her husband's desk since she had little understanding of it.

Other events of considerable significance also occurred during the same period as the disputed transactions. On January 6, 1970, Mrs. Ocrant negotiated a $403,000 non-purpose loan from Dean Witter, using her Standard Oil shares as collateral. The amount of the loan was approximately one-half the market value of the collateral shares at that time. Furthermore, on January 27, 1970, the settlement date of the first Standard Oil sales, Mrs. Ocrant was issued a check in the amount of $50,000 as proceeds of the sale. Thereafter, the following checks were also issued: $119,000 on February 25; $51,979 on February 25; $4,970 on March 16; and $27.50 on April 16, for total disbursements to Mrs. Ocrant from the account, including the loan, of $628,976.50 between January and May 1970. Each of the checks was promptly endorsed by Lawrence Ocrant and deposited in joint accounts maintained by him and his wife. The loan from Dean Witter was repaid with the proceeds from the sales.

While Mr. Ocrant conceded that he learned of the Standard Oil sales no later than March 1970, when he received the February account statement, Mrs. Ocrant denies having actual knowledge of the transactions until a November 1970 reconciliation meeting with her then estranged husband. She does, however, remember a meeting at the Dean Witter offices in January or February involving herself, her husband, and Mr. Waldbaum, at which her husband expressed concern over the Reading & Bates purchases and was attempting to learn the fund from which the purchases were made. In any event, Mrs. Ocrant's objection to the Standard Oil sales was not made known to Dean Witter until December 1970. In the interim, on July 27, 1970, Mr. Waldbaum, the executive in charge of the Ocrant accounts, committed suicide.

Without separately describing the several theories for relief advanced by the plaintiff, we shall say only that we agree with the district court that the breach of contract claim is the essence of the action, and that the other theories either turn on the same factors or were not adequately developed by plaintiff's proof at the trial to become issues. We must also agree that the key elements of the case are the agency relationship between Mrs. Ocrant and her then husband, and the delay of over nine months between the last Standard Oil sale and notice of Mrs. Ocrant's objections to Dean Witter.

Turning first to the agency question, we find uncontroverted proof that for purposes of management of the account, Lawrence Ocrant was his wife's agent throughout the period in question. Despite the informal manner in which the defendant conducted its business with the Ocrants, we are nevertheless convinced that Lawrence Ocrant was clothed with complete authority to direct the management of his wife's account. Mrs. Ocrant, herself, testified to this authority repeatedly. For over a year prior to the first Standard Oil acquisition, securities passed through Mrs. Ocrant's account in much the same fashion as her husband's and most if not all transactions were consummated without her specific approval. The fact that in, October 1970 the objectives of the account may have changed from speculation to long-term growth and security would have no effect on the agency relationship. Mrs. Ocrant continued to rely exclusively on her husband's skill and judgment in this regard also, and he directed the acquisition of the Standard Oil shares. Mrs. Ocrant continued simply to refer her monthly statements and confirmation slips to her husband. Nowhere in the record is there indication that Mr. Ocrant's traditional and well-established authority to handle the ac-

count was terminated. Although never reduced to writing, a clear example of the principal-agent relationship was shown.

Mrs. Ocrant relies on the Rules of the New York Stock exchange and particularly Rule 408 thereof to show that the agency power of her husband was never properly established. Rule 408 does in fact indicate a requirement that an agency be established in writing before a member, allied member, or an employee of a member organization exercises discretionary power in a customer account. We note, however, that this rule appears to extend only to the exercise of authority by the broker agent, and thus would not reach Mr. Ocrant's authority. Furthermore, while we recognize that in an appropriate case, violations of exchange rules designed for customer protection might give rise to a private cause of action (see, e. g., Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135 (7th Cir.), cert. denied 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88), such a case is not now before us. Throughout this action Mrs. Ocrant has stressed her complete reliance on her husband's skill and expertise to excuse her own inattentiveness and inaction. She cannot now reject that reliance for purposes of disaffirming his activities.

It is fundamental that absent statutory requirements, no particular formalities are needed to establish the principal-agent relationship. Rather, the relationship exists if the conduct of the parties manifests the willingness of one person to have another act for him subject to his control, and the consent of the other so to act. Appleby v. Kewanee Oil Co., 279 F.2d 334 (10th Cir.). The undisputed conduct of Mrs. Ocrant and her husband amply demonstrates such a relationship.

The disposition of the Standard Oil of California shares as the transaction challenged must be examined in light of the agency relationship. As mentioned, there is some dispute in the record whether Mr. Ocrant authorized the sale of the Standard Oil shares from his wife's account. Mr. Ocrant testified that he did not, and that he did not even learn of the sale until March 1970, when he examined the February account statement. For purposes of the directed verdict, we accept Mr. Ocrant's testimony, and therefore assume that at the time the Standard Oil was sold and the Reading & Bates was purchased, the transactions were accomplished without authority from either the principal or the agent. Thus we must consider the effect of the delay of over nine months between settlement of the last Standard Oil sale and Mrs. Ocrant's making known her objections to the sale.

Mrs. Ocrant disclaims actual, specific knowledge of the sales until the November reconciliation meeting with her husband, and thereby seeks to excuse the delay. The record, however, is uncontroverted that the monthly account statements and confirmation slips were mailed to Mrs. Ocrant and received by her. The fact that she chose not to examine them herself but to simply refer them to her husband cannot therefore excuse her lack of knowledge. Furthermore, Mr. Ocrant admits to having known of the Standard Oil sales as early as March 1970. In view of the continuing agency relationship between him and his wife, that knowledge must be imputed to Mrs. Ocrant. Scroggs v. Harkness Heights Land Co., 76 Colo. 597, 233 P. 831 (Colo.). Throughout the period in question Mrs. Ocrant demonstrated a continuing reluctance to familiarize herself with the affairs of her account at Dean Witter as well as a continuing exclusive reliance on her husband's considerable experience and knowledge as to brokers' practices and as to the market. Such an attitude on her part when coupled with the absence of evidence or allegation that relevant information was withheld or concealed from her simply cannot excuse her inaction.

We are reluctant, whether under the name of estoppel, ratification, or waiver,

to prevent a customer, by his mere silence, from holding his broker-agent accountable for unauthorized transactions. Nevertheless, we feel that the peculiarities of the transactions, when considered in light of the unusual facts of this case, necessitate the application of such a doctrine here. The account was in the name of Nancy Ocrant. For virtually any other purpose, however, Dean Witter's customer was Lawrence Ocrant. By his wife's own testimony, the husband's managerial authority and recommendations were unchallenged. Mrs. Ocrant's interest was not sufficient to cause her to examine the monthly account statements or transaction confirmation slips. It was in this context that Lawrence Ocrant learned no later than March 1970 of the Standard Oil sales. The record also shows that before this time, Lawrence Ocrant had accepted and negotiated checks drawn by Dean Witter representing the proceeds of the sales that were taking place. These proceeds were deposited in his and his wife's joint accounts. In view of the size of the checks, it is difficult to suppose that even so active a trader as Mr. Ocrant would be unaware of their source. In any event, we are left with an uncontroverted and unexplained delay of nine months between discovery of the sales and notice of Mrs. Ocrant's objections. Furthermore, the record shows that at least during the first five months of this period, the market price of Standard Oil of California was such that the shares could have been replaced for considerably less than the price for which they were sold. That an investor of Lawrence Ocrant's sophistication and awareness did not avail himself of this opportunity, had there been a mistake, suggests ratification of the original sales.

Looking at cases which have dealt with similar delays in similar circumstances, we find precedent for foreclosing Mrs. Ocrant from recovery. In Nash v. J. Arthur Warner & Co., Inc., 137 F.Supp. 615 (D.Mass.), the investors' continued acceptance of confirmation slips and statements which fully disclosed the challenged transactions was cited as a basis for barring recovery in an action for churning. An eleven-month delay in objecting to a short sale transaction was found to be a ratification and waiver, and estopped the investor from recovering in Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bocock, 247 F.Supp. 373 (S.D.Tex.). *Compare also* Royal Air Properties, Inc. v. Smith, 312 F.2d 210 (9th Cir.), and Herald Co. v. Seawell, 472 F.2d 1081 (10th Cir.).

Whether characterized as ratification, waiver, estoppel, or laches, we believe the totality of the undisputed facts compelled the trial court to direct the verdict for the defendant as it did. This court has often voiced the standard for directing a verdict. In Moore v. Shultz, 491 F.2d 294 (10th Cir.), we offered the following formulation:

" . . . This standard which we have said is to be applied to both judgments n.o.v. and to directed verdicts is that the evidence must be viewed in the light most favorable to the party opposing the motion (together with inferences which may be fairly drawn therefrom), and the verdict not directed nor the motion granted unless the evidence points all one way, and is susceptible of no reasonable inferences which sustain the position of the party against whom the motion is directed. The motion must also be denied if the evidence and the inferences, so examined, are such that reasonable men may reach different conclusions . . . . "

We have applied this standard to the evidence and undisputed facts of this case, and we are convinced that the district court was correct.

The judgment is therefore affirmed.