Fannye Rae MARSHAK, Plaintiff,

v.

BLYTH EASTMAN DILLON & CO.,
INC. and Robert A. Sanditen,
Defendants.

No. 74-C-308-C.

United States District Court,
N. D. Oklahoma.

Sept. 3, 1975.

Jack R. Givens, Jones, Givens, Brett, Gotcher, Doyle & Atkins, Inc., Tulsa, Okl., for plaintiff.

M. Darwin Kirk, Rucker, Tabor, McBride & Hopkins Inc., Tulsa, Okl., for defendants.

## MEMORANDUM AND JUDGMENT

COOK, District Judge.

Plaintiff, Fannye Rae Marshak, instituted the above styled action seeking damages and an accounting of profits on securities traded in her account by the Defendants, Blyth Eastman Dillon & Co., Inc., a brokerage firm, and Robert A. Sanditen, an em-

ployee of Blyth Eastman Dillon & Co., Inc., the individual broker who was in charge of Plaintiff's margin account. Plaintiff asserts violation of the provisions of the Securities and Exchange Act of 1934 with respect to "churning" of Plaintiff's account by the Defendants, unauthorized purchases and sales of securities for the Plaintiff's account and trading in the corporate Defendant's own securities without authorization.

Federal jurisdiction is invoked under the provisions of the Securities Exchange Act of 1934, particularly 15 U.S.C. §§ 78j, 78t, 78o and 78aa, and Rule 10b–5 promulgated by the Securities Exchange Commission 17 C.F.R. 240.10b–5.

██ The parties agree that the Defendant, Robert A. Sanditen, was, at all times material, an agent of the Defendant, Blyth Eastman Dillon & Co., Inc., and was acting within the scope and course of his employment in connection with the transactions complained of. In addition, it is agreed that Plaintiff's husband, Gerald Marshak, at all times material to this action, was acting as the agent of the Plaintiff within the scope and course of his authority in connection with the transactions which are the subject matter of this suit. Therefore, actions taken by the Plaintiff's husband and the extent of his knowledge and degree of sophistication are imputed to the Plaintiff.

The conduct of Defendants of which Plaintiff complains fall basically into three broad categories: 1) Churning, 2) Unauthorized trading, and 3) Unsuitable investments.

## CHURNING

██ " 'Churning' is a technical securities law term connoting excessive trading by a broker disproportionate to the size of the account involved, in order to generate commissions." *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 494 F.2d 168 (10th Cir. 1974).[1] The gravamen of an allegation of churning is the existence of fraud, referring to fraud in law. It is in the nature of constructive fraud in that it is considered a scheme under Rule 10b–5, the essence of which is deception of the customer and the reliance of customer on the integrity of the broker. *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, supra. The Courts have considered varying factors, which fall into three basic categories, to determine the existence of a churning violation: First, whether the trading was excessive; second, whether Defendant's purpose in buying and selling securities was to advance his own interests by generating commissions; and third, whether the Plaintiff client was relatively uninformed in the stock market and therefore relied on the competence of the broker.

██ "In a churning case the independent objectives of a customer are an important standard against which to measure claimed excessiveness." *Fey v. Walston & Co., Inc.*, 493 F.2d 1036 (7th Cir. 1974).[2] *Booth v. Peavey Co. Commodity Services*, 430 F.2d 132 (8th Cir. 1970); *Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417, 432 (N.D.Cal.1968), modified in part and aff'd, 430 F.2d 1202 (9th Cir. 1970); *Moscarelli v. Stamm*, 288 F.Supp. 453 (E.D.N.Y.1968). In this regard, the testimony is clear as to the objectives of the Plaintiff. Plaintiff's husband testified that during the time the account was handled by the Defendants: "We wanted profits." In addition, Defendant Sanditen testified that the Plaintiff's primary purpose and objective as stated to him by Mr. Marshak was the desire for quick short-term profits. In regard to

---

**1.** The SEC has defined "churning" in a regulation. See 17 C.F.R. 240.15(c) 1–7(a) which reads: "The term 'manipulative, deceptive, or other fraudulent device or contrivance,' as used in section 15(c) of the act, is hereby defined to include any act of any broker or dealer designed to effect with or for any customer's account in respect to which such broker or dealer or his agent or employee is vested with any discretionary power any transactions of purchase or sale which are excessive in size or frequency in view of the financial resources and character of such account."

**2.** Opinion by Judge Christensen, Senior District Judge of the District of Utah sitting by designation.

quick profits, Mr. Marshak advised that he considered quick profits to be the buying in one day and selling the next.[3] As noted in *Fey v. Walston & Co.*, supra, if a salesman does only what the customer independently has in mind as an objective, additional motive of the salesman to earn commissions does not convert the transaction into a deceptive or manipulative device.

■ As a technique to determine excessiveness regarding turnover, courts have also considered turnover rate of the account (defined as the aggregate amount of purchases divided by the average cumulative monthly investments.) *Stevens v. Abbott, Proctor & Paine,* 288 F.Supp. 836 (E.D.Va. 1968), *Hecht v. Harris, Upham & Co.,* 283 F.Supp. 417 (N.D.Cal.1968). The parties agree that the turnover rate in Plaintiff's account during the eleven months of heaviest trading which existed from October 1971 through August 1972 was 3.11. However, the turnover rate of the stock during the entire duration that the account was handled by the Defendants was only approximately 1.226. It cannot be said this is clearly excessive.

■ As previously stated, the second factor looked to in establishing "churning" is the objective of the broker in handling the account. It is recognized that churning differs from common law fraud in that proof of churning does not require proof of a specific or invidious intent to defraud. *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* supra. However, as stated in *Dzenits,* the term "churning" connotes action by the broker "in order to generate commissions." Therefore, the courts have compared the dealer's profits with the size of the customer's account in order to deter-

mine whether the broker's purpose was to generate commissions. As example, the Court in *Stevens v. Abbott, Proctor & Paine,* supra, noted that as of the date Plaintiff's portfolio was turned over to Defendants, it consisted of stocks in the amount of $204,600.01; and Defendants earned a commission thereon of $59,000.00 in the subsequent handling of the account. Likewise in *Hecht v. Harris, Upham & Co.,* supra, the churning of an account initially worth $533,161.00 produced commissions and mark-ups of $189,000.00. In the case at bar, the value of Plaintiff's account in terms of stock initially transferred thereto was approximately $150,000.00. As agreed to in the Pre-Trial Order filed herein, "the commissions paid by Plaintiff to Defendant corporation from the commencement of the account until its termination totaled $3,337.01." Plaintiff's Supplemental Trial Brief, filed herein, supplements this figure by adding an additional $749.37 for previously undisclosed broker's commissions on purchases and sales and a profit of $1,123.74 the brokerage firm made on "make-a-market" stock.[4] Even if the additional commissions alleged by Plaintiff are added to the totals, the total of $5,210.13 does not indicate that the broker's sole purpose in the handling of the account was to generate commissions, particularly in light of the fact that Plaintiff's investment objective was short term profit.

■ The third consideration is the evidence bearing upon the experience, sophistication or trading naivete of the customer. *Fey v. Walston & Co., Inc.,* supra. While the evidence reflects little doubt that Plaintiff, Mrs. Marshak, was not an informed investor, her husband, as stated, acted as her agent and therefore it is his knowledge

---

**3.** The Marshaks' investment objective of profits rather than, for example dividend income or long term growth, is further evidenced by the type of accounts they maintained with other brokerage firms. According to an expert witness in the brokerage field, an examination of the type and quality of stock maintained by the Marshaks in two other accounts showed it to be "non-rated," highly speculative stock.

**4.** Plaintiff alleges that purchases of stock on which Defendants were "making-a-market" are particularly suspect in that Defendants would make greater undisclosed profits when an investor purchased these stocks. It is worth noting, however, that on the purchases and sales of the "make-a-market" stock in the Marshak account, Plaintiffs made in excess of $800.00 profit.

of the stock market and his sophistication thereto that must be considered. Mr. Marshak first began trading in the stock markets in approximately the year 1958 and has had stock accounts with various brokerage firms since that time. During much of the time his account was handled by Defendants, he was a member of a stock club which met monthly to discuss various stock investments. Defendant Sanditen and other members associated with Blyth Eastman Dillon & Co. also attended various stock club investment meetings. He was also an occasional subscriber to the Wall Street Journal. Mr. Marshak testified that he personally went to Defendants' offices from three to five times a month to check on the account, stock prices, and review the general handling of the account. (Defendant Sanditen estimated Mr. Marshak visited their offices from two to three times a week.) In addition, Mr. Marshak advised that he talked with Defendant Sanditen over the telephone, "almost on a daily basis." Marshak, when asked if, during 1971, 1972, and 1973 he knew the price of almost every stock that he maintained for his wife in her portfolio, replied, "Yes sir." In addition, the Marshaks received confirmation slips on each transaction and monthly account statements. In the light of these factors, it cannot be said that Mr. Marshak was an uninformed investor.

According to the testimony of one expert witness, there are practically no sophisticated investors in this part of the country and many stock brokers themselves, he believed, cannot be considered sophisticated. It would obviously be impractical for the Court to require this high a degree of sophistication. Rather the Court must determine whether the investor is so uninformed that the stock broker is in a position to manipulate the account and perpetrate fraud on the unwary investor or whether, on the other hand, the investor is knowledgeable enough to warrant holding him responsible for the maintenance of his own affairs. The background of Mr. Marshak and participation in the handling of the account leads the Court to but one conclu-

sion, that being he was neither uninformed nor unsophisticated to such degree.

█ In light of Plaintiff's acknowledged objective of short term profits, the turnover rate cannot be considered excessive, nor can it be said that Defendants' purpose in the stock purchases and sales was contrary to the objective of the investor and for the sole purpose of generating commissions. These factors, plus the fact that Mr. Marshak cannot be characterized as an uninformed investor, lead the Court to conclude that the Defendants are not liable for churning.

## UNAUTHORIZED TRADING

Plaintiff also contends Defendants are liable for unauthorized trading. It is agreed by the parties that the account as set up by the Marshaks was ostensibly to be a nondiscretionary account, meaning that only Mrs. Marshak or her authorized agent could authorize transactions in the account. Defendants admit that various purchases and sales were made in the account without prior approval of the investor. Plaintiff alleges that in March of 1972 and again in April of 1972, Mr. Marshak voiced objection to Defendant Sanditen's superior, Mr. Chozen, about Sanditen's purchase of stock with authority. However, as Mr. Chozen testified, the only complaint he received from Mr. Marshak regarded the Defendant Sanditen's purchase of a particular stock, that being American La France, because he was not consulted prior to the purchase. Mr. Sanditen also testified that the only objection made by Mr. Marshak, as related to him by Mr. Chozen, regarded the American La France transaction. It appears from the evidence that the objection was not directed so much to the sale, but to the fact that the "quick profit" purposes of the account had not been achieved to the satisfaction of the Plaintiff. Mr. Marshak concedes that at no time did he voice any type of objection directly to Mr. Sanditen regarding the manner in which he was handling the account and concedes that he had every opportunity to voice such objection if he had so desired.

A similar allegation of unauthorized trading was litigated in *Ocrant v. Dean Witter & Co., Inc.,* 502 F.2d 854 (10th Cir. 1974). In *Ocrant,* the Plaintiff, an unsophisticated investor, opened a nondiscretionary account. She paid virtually no attention to the account and relied exclusively on her husband's judgment and knowledge. Mrs. Ocrant, as does Plaintiff in part in this case, relied on the Rules of the New York Stock Exchange, and particularly Rule 408. Rule 408 does in fact indicate a requirement that an agency be established in writing before a member, allied member, or an employee of a member organization exercises discretionary power in a customer's account. However, as stated by the Court in *Ocrant*:

". . . while we recognize that in an appropriate case, violations of exchange rules designed for customer protection might give rise to a private cause of action (see, e.g. *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 410 F.2d 135 (7th Cir.), cert. denied 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88), such a case is not now before us. Throughout this action Mrs. Ocrant has stressed her complete reliance on her husband's skill and expertise to excuse her own inattentiveness and inaction. She cannot now reject that reliance for purposes of disaffirming his activities."

In *Ocrant,* Plaintiff objected to the admitted unauthorized sale of stock nine months after the sale. The Court, noting that nine months prior to voicing an objection, Mr. Ocrant had sufficient information to put him on notice of the transaction, stated that the fact that an investor of Mr. Ocrant's sophistication and awareness did not avail himself of the opportunity to correct the mistake if one occurred, suggests ratification of the original sale. The Court noted cases dealing with similar circumstances which furnished precedent for the foreclosure of Mrs. Ocrant's recovery. For example, in *Nash v. J. Arthur Warner & Co.,* 137 F.Supp. 615 (D.C.Mass.1955), involving an allegation of churning, the Court denied plaintiff recovery stating therein:

"Neither the partnership nor the corporation has made any unreasonable or unusual profit in handling the account of any of the plaintiffs. Neither the partnership nor the corporation failed in any duty imposed upon them as brokers, fiduciaries, principals, or otherwise. Even if there had been a breach of duty, which there was not, each of the plaintiffs by repeatedly accepting confirmations and accounts which fully disclosed all aspects of the transactions, elected not to rely upon that breach. Moreover, by failing seasonably to make complaints of facts which each of the plaintiffs was informed, each would, in any event, be barred from the late assertion of any wrong alleged to have been done by the partnership or corporation."

The Court in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bocock,* 247 F.Supp. 373 (S.D.Tex.1965), denied recovery stating that it did not consider the Plaintiff's failure to object within an eleven-month period to be reasonable and was of the opinion that by his failure within a reasonable period to disaffirm, Plaintiff ratified, waived and was estopped from assertion of liability. The Court quoting from Meyer, the Law of Stockbrokers and Stock Exchanges (1931), stated:

"A customer who wishes to repudiate an act of his broker must do so with reasonable promptness. How much time may be taken for this purpose is not established by any fixed rule. It has been held in some cases that the disaffirmance must be made within a reasonable time; in others it must be made promptly; in still others, that it must be made immediately. It is clear, however, from the decisions that the customer may not delay very long after the wrongful act has been brought to his knowledge." [5]

The Plaintiff in *Hecht v. Harris, Upham & Co.,* supra, alleged that the defendant

---

**5.** The unauthorized transactions involved in the case at bar occurred between February and December of 1972. Except for the objection made in March of 1972, no other objection had been made at the time the account was closed out in November of 1973.

stock brokerage firm had handled her account in a manner contrary to her instructions and in a manner unsuitable to her needs by, among other things: (1) selling certain securities which Plaintiff had instructed him not to sell, (2) failing to preserve the investment nature, character and value of her account in accordance with her instructions, (3) purchasing speculative and low grade securities and by selling dividend paying securities, and (4) effecting the purchase and sale of securities and commodities without her knowledge or comprehension as to their significance or suitability. The District Court found that Plaintiff in her conduct was barred by estoppel and waiver from asserting these violations [6] noting that estoppel and waiver are defenses to a civil action under the Securities and Exchange Act and that also since there is no applicable federal statute of limitations, the doctrine of laches is also a defense. It should here be noted that in the case at bar the agreement signed by Plaintiff upon opening the account with Defendants states that any objections she has to the manner in which the account is handled will be promptly made in writing to the firm. It is agreed by all parties that no objections to the handling of the account was made in this form.

Four elements must be present to establish the defense of estoppel: (1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury. *Hecht v. Harris, Upham & Co.,* supra.

To invoke laches as a defense there must be (1) a lack of diligence by the party against whom the defense is asserted and (2) prejudice to the party asserting the defense. *Costello v. United States,* 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551, 562 (1961).

Plaintiff relies heavily on the fact that she, through her husband, voiced objection to the handling of the account. While it is in dispute whether Mr. Marshak merely called once and objected to a single transaction or whether he made a general objection, there is no dispute that any objection, of whatever type, whether made once or twice, occurred in March of 1972 after which no other complaint was made although Mr. Marshak was in almost daily contact with Defendants. It is equally clear and undisputed that Mr. Marshak at no time indicated to Defendant Sanditen any displeasure with the manner in which he was handling the account. Plaintiff contends that because of the 1972 incident, Defendants were not "ignorant of the true facts" and therefore cannot assert estoppel. However, in light of Mr. Marshak's objection and the fact that while being in daily contact with the Defendants, aware of the subsequent unauthorized transactions, he made no other comment whatsoever of displeasure either to his broker or to the firm, the Court finds that the Defendants did not have knowledge that Plaintiff disapproved of their handling of his account as complained of in this action.

In view of these factors, the Court finds that Plaintiff is estopped from asserting an action for unauthorized trading.

## UNSUITABLE INVESTMENTS

The Plaintiff's third "category" of liability is based on the doctrine of "unsuitability" and is grounded in negligence and not fraud. Article III, Sec. 2 of the National Association of Security Dealers Rules of Fair Practice provides:

"In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable ground for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."

6. The Court did allow her partial recovery based on her allegation of churning.

This is in keeping with the so-called "Know Your Customer" rule of the New York Stock Exchange regarding the duty of the broker to be personally informed as to the essential facts relative to the customer and to the nature of the proposed account.

In this regard, Defendant Sanditen did know the Marshaks personally and on a social basis, and had visited in their home, had been on gambling junkets to Las Vegas with Mr. Marshak, knew the type of job he held, and had, of course, been informed by Mr. Marshak as to how he desired the account to be handled.

As to Plaintiff's other allegations, while Defendants may not have handled the Marshak account in the highest exemplary manner, it cannot be said their conduct constitutes negligence. In addition, for the Marshaks to recover damages for negligence, it would have to be shown that Defendants' negligence was the proximate cause of Plaintiff's loss. This, the evidence fails to disclose.

An examination of the account shows stock market conditions to be the main factor in the substantial loss sustained by Plaintiff. Mr. Marshak testified that the account with the Defendants was opened in 1971 with 1,000 shares of National Service Industries stock to which 3,400 shares of the same stock were added. This stock was the "backbone" of the Marshak account and Mr. Marshak had instructed Defendants that no shares of this stock were to be sold. At trial it was agreed that in 1971 the National Service Industries stock sold for approximately $28.00 per share; in 1972, for more than $30.00 a share; however, in November of 1973 when the account was closed, the stock had dropped to $10.00 or $11.00 per share. This factor alone accounted for a loss of over $100,000.00. In addition, when the margin account was originally opened at Blyth Eastman Dillon, the firm loaned the Marshaks $10,000.00 with the National Service Industries stock as security. When Plaintiff's account at Van Alstyne Associates, Inc., and Schneider Bernet & Hickman were transferred to the Defendants, the accounts transferred were undermargined by $49,307.00 and Defendants had to pay this amount to the two brokerage firms upon acceptance of the Marshak account.

Losses were also sustained on stock which was sold to meet margin calls in the Marshak account occasioned by the general condition of the stock market itself. A maintenance call, followed by a margin call, is made to the investor whenever the value of the stock he has put up as a margin falls below the required percentage. The investor then is given the option of supplying more capital for the account or selling a portion of his stock to cover the deficit. When the Marshaks received margin calls in their account in 1973, they could supply only an additional $1,000.00 to meet the calls, and, therefore, directed Defendants to sell the amount of stock required. It is difficult to calculate what portion of the loss sustained in the sale of these stocks is attributable to this "forced sale."

The Courts have long recognized that "the purpose of the Securities Exchange Act is to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act." *Royal Air Properties, Inc., v. Smith,* 312 F.2d 210 (9th Cir. 1962); *Hecht v. Harris, Upham & Co.,* supra; *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Bocock,* supra.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Defendant is not liable in damages for churning, unauthorized trading or unsuitable investments.