CULVER, Respondent, vs. WEBB (T. B.) and others, Appellants.

WEBB (ELIZABETH), Respondent, vs. SAME, Appellants. [Two cases.]

*December 9, 1943—January 18, 1944.*

480

For the appellants T. B. Webb and Hartford Accident & Indemnity Company there was a brief by *Brazeau & Graves* of Wisconsin Rapids, and oral argument by *R. B. Graves*.

For the appellant Douglas Culver there was a brief by *Fisher, Reinholdt & Peickert* of Stevens Point, and oral argument by *R. T. Reinholdt*.

*Wendell McHenry* of Waupaca, for the respondents.

WICKHEM, J.  I. Webb and Elizabeth Webb were father and mother respectively of T. B. Webb and Catherine Culver,

and resided at Manawa, Wisconsin. T. B. Webb lived at Ogdensburg, Wisconsin, where he was manager of a garage and sales agency. On or about August 4, 1941, the parents planned to go by train to visit sons living in Eau Claire and Chippewa Falls. T. B. Webb induced the parents to abandon the train trip and offered to drive them in his car. It was agreed that he should do this on August 8th. On August 7, 1941, when T. B. Webb arrived home from work he discovered that his sister, Catherine Culver, and her husband, Douglas Culver, had stopped on the way to visit the parents in Manawa. The Culvers were on a vacation. T. B. Webb had made two out-of-town trips that week and was tired out and behind with his .work. So he drove over to the home of his parents to induce Douglas Culver to take the parents to Chippewa Falls and Eau Claire for him. He agreed to furnish his car and all the gas necessary for the trip. Culver did not make up his mind that night but on Friday morning called Webb and agreed to make the trip. Culver drove his own car to Ogdensburg and got Webb's new four-door sedan which Webb had filled with gas for the trip, the understanding being that Catherine Culver would go along so that she also would have a visit with her brothers. Culver planned on coming back immediately. That afternoon at 1:30 p. m. Culver left Manawa with the parents, I. Webb and Elizabeth Webb, his wife, Catherine Culver and the Culvers' infant son as guests in the car. They traveled west on Highway 10 to the place of accident which was about a mile and a half·west of Stevens Point, in front of the "Little Club Tavern." The foregoing facts are important in respect of contentions made that Culver was the agent of T. B. Webb in driving the car.

The following facts bear upon contentions that the jury's finding on the negligence questions are unsupported by the evidence. The accident happened in front of the "Little Club Tavern" which is on the north side of the state trunk highway. A circular driveway leads into the tavern and the front of the tavern is about fifty feet back from the north edge of the

cement.    Highway 10 is straight and level for more than half
a mile in either direction, and is a twenty-foot concrete high-
way with a six-foot macadam shoulder.    The only, witnesses
as to how the collision occurred were Douglas Culver and
Henry Kjer, driver of the car with which Culver collided.

Kjer's version of the accident is that he had left his farm
near Junction City around 11 o'clock a. m. and traveled east
on Highway 10.    Shortly thereafter he had a flat tire and
while repairing his tire lost his car key in the grass.    Because
of the delay he stopped at the "Little Club Tavern" for lunch
and was there about twenty minutes, his car being in the drive-
way of the tavern facing east.    On completion of his lunch
he proceeded to drive onto the highway.    He claims to have
looked both ways when about twelve feet from the cement and
to have seen the Culver car coming from the east, seven hun-
dred or eight hundred feet away.    He then drove onto the
highway and asserts that he was on the right side of the black
line facing east when he was hit by the Culver car.    He tes-
tified that the Culver car was going upwards of eighty miles
an hour at the time of collision, but also stated that after his
first sight of it he neither looked at nor saw it until it was
fifteen feet away from him. .

Culver's version of the accident is that he saw the Kjer car
when he was "two or three hundred feet, possibly more" to
the east of it; that the Kjer car had started to move toward the
highway in a southeasterly direction.    Culver blew his horn
but Kjer kept on coming and then Culver blew his horn a
second time.    He claims that the Kjer car never changed speed
or stopped, until the time of impact.    Culver continued to
travel on his own side of the road at fifty miles an hour until
he first blew his horn at which time he put his clutch down and
applied the brakes very slightly.    He blew his horn a second
time but was not able to say how far away the Kjer car was at
that time.    At about fifty feet from the Kjer car he put the
brakes on hard and swerved to his left to avoid collision.    At
this time the Kjer car was only two feet from the cement and

Culver then knew that Kjer intended to enter the highway and proceed to the east. The collision occurred near the center of the highway, the Kjer car coming to rest approximately squarely across the middle of the highway. The Culver car went off the road to the left and into a ditch.

It will be convenient first to consider the various contentions in this case in respect of negligence. The question whether Culver was negligent as to lookout was not submitted to the jury. Plaintiffs maintain that there was negligent lookout, or at least an issue with respect of it, and that the issue should have been submitted.

The record plainly indicates that Culver saw the Kjer car in time to take measures for the protection of his guests. He also saw the car at the time he sounded his horn a second time and when the Kjer car was about to enter the highway. The claim that there is evidence warranting submission of the question as to lookout is based upon the fact that Culver, as an excuse for some indefinite answers to questions on cross-examination as to the distance of the Kjer car from the highway at various times after he first saw it, stated that he did not pay particular attention to the Kjer car. We are of the view that this is much too ambiguous and indefinite to warrant submission of a separate question as to lookout. Such an answer may go to witness' recollection or to the accuracy of his estimates at various stages in his approach, or it may be accounted for by the fact that he had necessarily to observe other things in addition to the Kjer car in driving his own car. Not more than three or four seconds elapsed between the time when he first saw the Kjer car and the time when the collision occurred. He observed the Kjer car at least three times during that period, and if he was unable to make accurate estimates at the various stages of his progress it seems to us that has very little bearing upon the subject of lookout. To the extent that it does not indicate merely a want of testimonial recollection its bearing, if any, is upon his skill and judgment or the conscientious exercise of these qualities. If so, it is linked, for what-

ever it is worth, with the question of negligent control and management.

Defendants claim that there is no evidence to sustain the separate finding of the jury that Culver was driving the car at an excessive speed. All of the evidence in the record, with the exception of that furnished by Kjer, is to the effect that Culver maintained a general speed of about fifty miles per hour, and none of the parties claim that this was excessive or that it gave any of the guests occasion to protest. Kjer's testimony that he estimated the speed of the Culver car at seventy to eighty-five miles per hour is of no value whatever. He testified that after observing the Culver car some seven hundred or eight hundred feet away and estimating that he had plenty of time to get onto the highway ahead of it, he neither looked for nor saw the Culver car until it was about fifteen feet from him. This conclusively shows that he had no testimonial qualifications as to the speed of the Culver car. It is inconceivable that he could make a useful estimate from a fleeting glance a split second before the cars collided. Plaintiffs disclose the real relation of speed to the case by contending that while there was no negligent speed up to the time Culver saw the Kjer car, there was a failure on the part of Culver to reduce his speed, and that therefore the speed of the car at the time of collision was excessive. This is just another way of saying that Culver's default was his failure properly to control his car. If upon seeing the Kjer car he should have reduced his speed in order to bring his car under better control, that goes to the way in which he managed his car. It is our conclusion that there was no evidence of negligent speed, if that term be considered to refer to the general rate at which Culver was driving the car. Culver saw the Kjer car in time to cut his speed and bring his car under control. Whether he did so, and otherwise handled his car so as to discharge his duty to his guests, presents a question of management and control. Since in point of time all of Culver's negligence occurred after

he saw the Kjer car, there was no time for protest by the guests, and if the latter are to be held to have assumed any risks it must be because Culver's failure was in the field of skill and judgment and did not constitute a neglect conscientiously to exercise what skill or judgment he had. *Monsos v. Euler*, 216 Wis. 133, 256 N. W. 630; *Young v. Nunn, Bush & Weldon Shoe Co.* 212 Wis. 403, 249 N. W. 278. We hold that there was a jury question whether Culver discharged his duty as host in respect of management and control. Upon observing the Kjer car Culver threw his car into freewheeling, a maneuver which notoriously does not add to the control of the driver. He very slightly cut his speed by touching the brake lever. He kept to his course up to within a few feet of the accident and there is very little evidence of a substantial diminution of speed during that interval. Certainly, the impact with the slow-moving Kjer car was of sufficient violence to indicate substantial speed. His attention to the Kjer car was not sufficient to enable him to ascertain the intention of its driver until the very last moment before the collision. At this moment he slammed on his brakes and turned to the left to avoid the collision. Culver was an experienced driver and a jury could say that his management of the car after he became sufficiently aware of the Kjer car to sound his horn was not a conscientious exercise of his skill and experience. He could be thought by the jury to have proceeded into a dangerous situation with so little margin of safety and with so little precaution as to violate his legal duties to his guests. That inferences more favorable to Culver might reasonably be drawn is immaterial. We postpone for the moment the question whether the matter was so put to the jury that the finding of negligent want of control actually found a violation of the host-guest relationship.

We now come to a question concerning the insurance coverage that presents substantial difficulties. On November 29, 1940, defendant insurance company issued to T. B. Webb, doing business as Webb Auto Sales, what is denominated

"Garage Liability Policy" (National Standard Garage Liability Policy). This policy had a limitation of $5,000 per person and $10,000 for each accident so far as liability for bodily injury was concerned, and a limit of $5,000 for property-damage liability. The insurer agrees to pay all sums which the insured shall become obligated to pay by reason of liability imposed by law for bodily injury "arising out of such of the operations hereinafter defined as are indicated by specific premium charge or charges." Division 1 of that portion of the policy labeled "Definition of Operations" reads as follows:

"The ownership, maintenance, occupation or use of the premises herein designated, including the public ways immediately adjoining, for the purpose of an automobile dealer or repair shop, and all operations either on the premises or elsewhere which are necessary and incidental thereto, including repairs of automobiles or their parts, and ordinary repairs of buildings on the premises and the mechanical equipment thereof; and the ownership, maintenance and use of any automobile for any purpose in connection with the above-defined operations, *and also for pleasure use.*"

Paragraph 6 of the "Conditions" of the policy reads as follows:

"Such insurance as is afforded by this policy for bodily injury liability or property damage liability with respect to any automobile owned by the named insured shall comply with the provisions of the motor vehicle financial responsibility law of any state or province which shall be applicable with respect to any such liability arising out of the ownership, maintenance or use of such automobile during the policy period, to the extent of the coverage and limits of liability required by such law, but in no event in excess of the limits of liability stated in this policy."

Paragraph 12 of the "Conditions" reads:

"In the event of any payment under this policy the company shall be subrogated to all the insured's rights of recovery therefor and the insured shall execute all papers required and

shall do everything that may be necessary to secure such rights."

Paragraph (b) of that portion of the policy designated "Exclusions" provides in part that this policy does not apply—

"To the *ownership, maintenance or use for pleasure purposes* of any automobile not owned by or in charge of the named insured for use principally in such operations."

Defendant insurance company contends that since this is a garage policy the rule of *Mauel v. Wisconsin Automobile Ins. Co., Ltd.,* 211 Wis. 230, 235, 248 N. W. 121, applies and the omnibus coverage provision prescribed by sec. 204.30 (3), Stats., is not incorporated into the policy. If this contention is sound, then Culver is not protected by the policy and if he was the agent of Webb he would sustain a liability to Webb for the consequences of his negligent operation of the car. The insurer would be subrogated to Webb's right of recovery against Culver.

Culver maintains that the introduction into this policy of coverage on cars owned by the insured and used "for pleasure purposes" makes this policy subject to the requirements of sec. 204.30 (3), Stats., and requires that the omnibus coverage clause be imported into the policy. In the *Mauel Case, supra,* this court construed sec. 204.30 (3) as not applicable to a policy issued to a public garage with the result that the omnibus coverage clause is not imported into this class of policy.

This construction was not arrived at without some difficulty and, as pointed out in the later case of *Paine v. Finkler Motor Car Co.* 220 Wis. 9, 264 N. W. 477, was not an obvious construction. It did, however, accord with the construction theretofore given to the statute by the insurance commissioner and thus had a measure of support on the grounds of practical construction. In *Ederer v. Milwaukee Automobile Ins. Co.* 220 Wis. 635, 265 N. W. 694, and *Paine v. Finkler Motor*

*Car Co., supra,* this court held that the omnibus coverage clause imported into policies by sec. 204.30 (3), Stats., does not apply to make public garages or their agents additional assureds. The court has consistently refused to modify the rule in the *Mauel Case, supra,* because that construction has survived several legislative sessions and there has been no effort to change the law. Hence, the section may definitely be said not to require an omnibus coverage clause in garage policies and not to extend the omnibus coverage clause in the ordinary privately owned car policies to public garages. So far there is no difficulty. The difficulty arises out of certain statements in the *Mauel Case* which seem to imply that there are only two varieties of policies, "the privately owned car policy which is affected with the omnibus coverage, and the other known as public garage policy which is excluded therefrom." In the *Mauel Case* the court said:

"In the privately owned car policy the car is definitely described as to motor, serial number, and type, and is issued in consideration of the payment of a fixed premium; a public garage policy does not insure any particular car and insures against liability imposed on a garage because of negligent handling of cars irrespective of ownership. These distinctions are important in construing the statute involved."

Although the foregoing may give some color to the contention that it was meant to hold that unless a liability policy describes a particular automobile and unless its owner is not the owner of a garage, the omnibus coverage is not imported into the policy, the court did not mean any such thing. The court simply described two general types of policy: (1) Public garage policies which insure against liability arising from operation of the garage business including negligent handling of cars, irrespective of ownership, and (2) policies in which the specified owner of a specified car is insured against liability arising out of its operation. The mere fact that the holder

of a liability policy happens to be the owner of a garage is not of any significance, and a statutory attempt to attach legal consequences to it would raise serious constitutional objections based upon a claim of arbitrary classification. Neither is the description of a particular automobile owned by the assured of essential importance. The statutory purpose is to draw a distinction between a policy issued to a garage to cover liabilities arising out of the general operations of the garage business and one issued to protect the owner of an automobile as such from liability for the operation of that automobile.

'In this case the insurance company by including a coverage of the owner of the garage for pleasure purposes has introduced into a standard garage policy the essential features of those policies which under sec. 204.30 (3), Stats., are required to include the omnibus coverage clause. Under definition of operations the policy purports to cover—

"The ownership, maintenance or use of any automobile for any purpose in connection with the above-defined operations, and also for pleasure use."

The policy also contains a provision to the effect that—

"The terms of this policy shall apply separately to each automobile insured hereunder."

By assuming to insure Webb against liability arising out of the operation of his car for pleasure, the insurer, to the extent of this obligation, has created a "privately owned car policy" and by operation of sec. 204.30 (3), Stats., the omnibus coverage clause is applicable to this engagement. Culver was an additional assured under the policy and within the limits of the policy he is entitled to coverage as such assured.

In respect of the question of agency it is contended by Hartford Accident & Indemnity Company that there is no evidence that Culver was agent for Webb and that at most there was an

issue for the jury. We conclude that this contention is not sound. There was no conflict in the evidence, and there are no conflicting inferences to be drawn from the facts. Upon the record Culver was agent for Webb as a matter of law. Webb had agreed to drive his parents from Chippewa Falls to Eau Claire. There might be a serious question whether Webb, had he personally carried out his agreement, would not simply have discharged a social courtesy of the sort frequently held by this court not to be the foundation for an agency. *Hynek v. Milwaukee Automobile Ins. Co.* 243 Wis. 591, 11 N. W. (2d) 352. However, having made the engagement, feeling obligated to execute it, and finding it inconvenient to go—he induced Culver to take his place, furnished his car for this purpose and paid the expenses of the trip. Whatever the character of Webb's obligation, he made Culver his agent. Culver was serving the convenience of Webb in discharging his promise to his parents. That is something more than a mere courtesy.

Since Culver was Webb's agent and was covered by the liability policy, it follows that the insurer has no rights by subrogation to recover from Culver the liability which he cast upon Webb. Indeed, the company is as liable to protect Culver as it is to protect Webb. The conclusion that Culver was agent for Webb in driving the car, results, of course, in Webb's liability to plaintiffs. As between Culver and Webb, Culver as the negligent agent is liable to indemnify Webb. *Archer v. Chicago, M., St. P. & P. R. Co.* 215 Wis. 509, 255 N. W. 67. This is important only as to the amount of damages awarded in excess of the policy limits.

We now come to the question whether the cause was properly submitted to the jury. As has heretofore been stated, there was a jury question not only whether Culver was negligent as to management and control, but also whether this negligence constituted a failure on his part conscientiously to exercise such judgment and skill as he had. The questions

submitted merely required the jury to find whether Culver was negligent in respect of having his car under proper control. No question was so framed as to elicit a finding as to Culver's violation of the host-guest relationship. This court has several times pointed to the necessity that host-guest cases be so submitted as to produce findings bearing upon relationship. *Waters v. Markham,* 204 Wis. 332, 235 N. W. 797; *Young v. Nunn, Bush & Weldon Shoe Co., supra.* In *Bohren v. Lautenschlager,* 239 Wis. 400, 1 N. W. (2d) 792, this court held that it was reversible error in a host-guest case where the issue was management and control for the court not to submit the question whether such negligence was the result of lack of skill and judgment. In some cases such as *Monsos v. Euler, supra,* where an ordinary negligence question is followed by a question as to plaintiff's assumption of risk, the situation may be such upon the whole record as to warrant the conclusion that the issue was sufficiently put to the jury. In this case, we have nothing but a straight finding of negligence in respect of management and control. Culver could have been negligent in this respect as to Kjer without violating any duty to his guests provided his default was the result of a lack of skill and judgment. Proper requests were made to submit questions calculated to present the issue accurately to the jury and we cannot escape the conclusion that prejudicial error resulted from the manner of submission. Nothing in the instructions cured the error, if indeed, it could be cured by instruction.

Another error which calls for reversal requires little discussion. The trial court gave the following instruction:

"It is the duty of every automobile driver to take all reasonable care and precaution to avoid collision with any other traveler or vehicle, and to that end to so limit his rate of speed and so control the movement of his vehicle, that he is not likely to endanger and does not endanger the property, life or limb

of any person. Failure to perform that duty constitutes negligence."

This court held an identical instruction erroneous in *Lembke v. Farmers Mutual Automobile Ins. Co.* 243 Wis. 531, 11 N. W. (2d) 169, 12 N. W. (2d) 18, and we adhere to that conclusion.

Plaintiff claims that the instruction was not necessarily prejudicial but the case of *Schmallenberg v. Smith*, 237 Wis. 285, 291, 296 N. W. 597, principally relied on by plaintiff, is clearly distinguishable. In that case it was said:

"It is suggested that this was prejudicial error and, of course, it must be held that it was at least error. If in this case the only charge made or found was negligent control, or if there had been a finding of negligence on plaintiff's part, the judgment would have to be reversed. It is evident, however, that the prejudicial effect of this instruction could not have extended beyond the question as to control and management, and since there were other findings of negligence on defendant's part and no finding of negligence as to plaintiff, the instruction was not prejudicially erroneous."

In this case the only issue relates to negligent control and the only supportable finding is upon that issue. Since there must be a new trial there appears to be no occasion to discuss contentions that other errors were committed upon the trial and that the damages were excessive.

*By the Court.*—Judgments reversed, and causes remanded with directions to grant a new trial.