**Wendee HENRICKSEN, Plaintiff,**

v.

**George HENRICKSEN and Smith, Barney, Harris, Upham & Co., Inc., Defendants.**

**No. 78–C–208.**

United States District Court, E. D. Wisconsin.

March 10, 1980.

Fox, Carpenter, O'Neill & Shannon by Bruce C. O'Neill, Milwaukee, Wis., for plaintiff.

Thomas P. Doherty, Atty., Milwaukee, Wis., for Geo. Henricksen.

Quarles & Brady by W. Stuart Parsons, Milwaukee, Wis., for defendants.

## DECISION and ORDER

MYRON L. GORDON, District Judge.

The plaintiff Wendee Henricksen seeks to recover in this action the approximate sum of one hundred and twenty thousand dollars from her former husband, George Henricksen, and his former employer, Smith, Barney, Harris, Upham & Co., Inc. (Smith Barney). The complaint states eight claims and alternative claims for relief, based on provisions of the federal securities laws, state common law, and certain rules of the New York Stock Exchange and the National Association of Securities Dealers. A two day bench trial was held in early January 1980, and the parties have submitted post-trial briefs. This opinion constitutes the court's findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure.

## I. BACKGROUND

The plaintiff and George Henricksen were married in August 1969. In January 1970, Mrs. Henricksen received a bachelor of arts degree. The Henricksens moved to New York where George Henricksen underwent a six month training program with Smith Barney to become a stockbroker. The Henricksens then moved to Milwaukee, and Mr. Henricksen worked for Smith Barney as a registered representative from 1970 through 1977, the time period covering the events pertinent to this case.

On June 19, 1972, the plaintiff opened a customer account at Smith Barney. The mailing address listed on the permanent account record was the Henricksen's home address. At that time, Mrs. Henricksen's investment objectives were recorded on Smith Barney's new account form. This document sets forth five possible investment objectives, ranging in five steps from "conservation of capital with stable income," the most conservative investment come," the most conservative investment plan, to "speculative capital gains," the most speculative investment plan. The investment objective indicated for the plaintiff's account was step two, "long-term growth of capital—income secondary." The account was opened as a discretionary account, which meant that the plaintiff gave George Henricksen a power of attorney over the account. This power of attorney was formally evidenced by a written memorandum signed by the plaintiff, dated August 23, 1972.

The first transaction occurred in the account in June 1974, when Mrs. Henricksen deposited 17 shares of duPont stock. These shares were sold in June 1975, and 100 shares of J. D. Searle were purchased with the proceeds.

On July 2, 1975, Mrs. Henricksen signed a customer's option agreement which, she testified, she did not read before signing. The agreement states that the person signing it has "been furnished with the current Prospectus of The Options Clearing Corporation," and has "read it and particularly noted those buy and sell sections pertaining to Risk Factors, Suitability and Limitations on Position and Exercise, . . ." The plaintiff testified that she was not furnished a copy of the prospectus before signing the option agreement and that she would not have understood it had it been furnished. The option agreement further states that the plaintiff agreed:

"1. To make transactions in Options and other securities only in such manner as is consistent with my investment and/or trading objectives and with my overall and then existing financial circumstances."

The instrument also stated:

"14. I have read and fully understand the terms and conditions of this agreement. I believe that I am capable of evaluating, carrying and bearing the financial risks inherent in all options trading."

At this time, two Smith Barney records were prepared and maintained with regard to the plaintiff's option account: an option

client information sheet and an option client approval sheet. The information sheet stated that the account was a single, not a joint, account, that the plaintiff's estimated net worth was between $100,000 and $250,000, that her annual income was $5,000 and her husband's was $30,000, and that her assets totaled $123,000. Her investment objectives were stated to be "growth," rather than "income" or "speculation." The possible types of anticipated option transactions were listed as:

"a. Unsolicited transactions only
b. Purchasing Calls
c. Covered Writing
d. Spreading
e. Uncovered Writing
f. Discretionary Transactions."

The only type of transaction checked for the plaintiff's option account was "covered writing." The option client information sheet was signed by George Henricksen.

The option client approval sheet indicated that the account was a discretionary account and that the client's husband held a power of attorney over the account. This record then reflects, opposite the same categories listed on the information sheet, that the plaintiff's account was "Approved for Covered Writing Transactions Only." This document was signed by the branch manager of Smith Barney's Milwaukee office, Smith Barney's registered options principal, and by a member of its compliance review section.

Richard Vermillion, the Milwaukee branch manager from June 1975 through October 1976, testified that copies of both of these Smith Barney records were on file in his office, but Leonard Walsh, Mr. Vermillion's successor, testified that he was unaware of the existence of these records. George Howard, a member of Smith Barney's compliance section, testified that a copy of the client option approval sheet for the plaintiff's account is still on file in his office. Mr. Howard also testified that sometime between April and October, 1976, a "yellow card" was sent to every registered representative for him to designate his option clients' investment objectives and

that the plaintiff's account was thereafter programmed into Smith Barney's new computer system as approved for call purchasing transactions. However, Mr. Howard stated that the yellow card for the plaintiff's account could not be located, and no such card was ever produced at trial.

On November 3, 1975, Mrs. Henricksen executed another document giving her husband a power of attorney over her account at Smith Barney. This document, which the plaintiff testified she did not read before signing, provides:

"That I, Wendee Henricksen of 8334 North Links Way, City of Milwaukee, State of Wisconsin, have made, constituted and appointed, and by these presents do constitute and appoint George B. Henricksen my true and lawful attorney for me and in my name, place and stead, to manage, handle and direct all accounts now standing in my name, or which may at any time be opened by me or in my name, with Smith, Barney & Co. Incorporated, to buy and sell bonds, stocks and other securities in my name; for me in my name to make, execute and deliver assignments and transfers of any and all stocks and bonds, and to that end to sign my name to any and all written instruments which may be required in connection with such transfer or hypothecation.

"This power of attorney shall apply to and cover all accounts which I may have with Smith, Barney & Co. Incorporated, until written notice of revocation hereof is given by me to said Corporation, and I hereby ratify and confirm any and all acts which may hereafter be done or caused to be done by virtue hereof by my said attorney giving and granting unto my said attorney full power and authority to do and perform all and every act and thing whatsoever requisite and necessary to be done in and about the premises as fully to all intents and purposes as I might or could do if personally present."

On January 20, 1976, Mrs. Henricksen signed a margin contract with Smith Barney. This agreement provided that, in connection with any indebtedness incurred as a

result of transactions in the plaintiff's account, Smith Barney "may charge monthly, as interest or otherwise, such sums to compensate [Smith Barney] for advances made on my account as [Smith Barney] may determine to be reasonable in view of the current cost of money." Although the plaintiff also did not read this document before she signed it, she testified that she had Mr. Henricksen explain it to her.

Also in January 1976, the plaintiff deposited into her Smith Barney account six so-called "blue-chip stocks," $8,000 in cash, and 822 shares of Badger Meter stock in the form of non-saleable voting trust certificates all of which she had received from a trust. As of January 26, 1976, the plaintiff's Smith Barney account, including the 100 shares of J. D. Searle stock and excluding the 822 shares of Badger Meter stock, had a fair market value of $105,814. After the cash was used on January 28th to purchase stock in Kennecott Copper Corporation, the plaintiff's account, at the end of January 1976, consisted of the eight "blue-chip" stocks and the non-saleable Badger Meter certificates. The plaintiff testified that she and her husband had an express understanding that these stocks and the capital they represented were to be conserved and ultimately dedicated to the education and other needs of the couple's daughter, Heather.

In February 1976, George Henricksen arranged to have the address on the plaintiff's account changed from the couple's home to the Smith Barney office. Henceforth, the monthly statements, confirmation slips, and any checks issued out of the account were received by Mr. Henricksen at his office. With regard to changes of address, Smith Barney's compliance manual provides:

> "Customer requests for change of address should be carefully reviewed and a letter sent to customer's old address acknowledging receipt of customer's request to change the address to a new address."

Although Smith Barney was unable to produce at trial either a written request for a change of address from the plaintiff or a letter from Smith Barney to the plaintiff acknowledging the address change, Richard Vermillion testified that he believed George Henricksen had submitted a written request. He further testified that Mr. Henricksen, either then or later, explained that the change of address made it more convenient for him to deposit checks issued from the plaintiff's Smith Barney account into the couple's joint savings account, because the savings account was maintained with a bank that had an office in the same building as the Smith Barney office, and that the savings account deposits were made in order to shelter a portion of his wife's assets during bad market conditions. Leonard Walsh testified that George Henricksen informed him that the address change allowed him to keep all of the records of the account at his office, simplifying the preparation of the plaintiff's income tax returns.

By the end of October 1977, the only securities in the plaintiff's Smith Barney account were the 822 shares of nonsaleable Badger Meter stock; between January 1976 and November 1977, not counting these 822 shares, the equity in the account was reduced to zero. During this period, George Henricksen caused seventeen checks totaling $54,798.51 to be drawn on the account in the plaintiff's name but delivered to him at his office. Another check for $558.40 was issued on January 20, 1976, when the address of the account was still listed as the couple's home address. The plaintiff did not personally endorse the checks, but an endorsement nevertheless was placed on the checks; drafts totaling $43,825.57 were deposited into the couple's joint savings account. Within days of each deposit, however, an amount equal or approximately equal to the amount deposited was withdrawn from the savings account. Also during this period the account lost $33,564.31 in the purchase of calls, a form of options trading. Finally, a total of $17,872.24 was paid to Smith Barney in commissions over the same period, as was $3,882.41 in interest charges on margin transactions. Thus, between January 1976 and November 1977, the account was drained of a total of $110,-675.87 in cash withdrawals, trading losses, commissions and interest.

The plaintiff presented evidence at trial showing that Smith Barney's local managers knew that during 1976 and 1977 George Henricksen had engaged in gambling and heavy drinking. Richard Vermillion testified that he knew that Mr. Henricksen had been to Las Vegas several times during 1976 and had reportedly won over $10,000 on one such visit. Mr. Vermillion further testified that he was concerned about George Henricksen's personal life and that he counseled Mr. Henrisksen on numerous occasions in an effort to persuade Mr. Henricksen to stop gambling. Leonard Walsh also testified that he was aware of George Henricksen's gambling.

In October 1976, the plaintiff and George Henricksen separated; Mr. Henricksen moved out of the couple's home. Mr. Vermillion and Mr. Walsh were aware of the separation, but both testified that they believed a reconciliation was possible. In the spring of 1977, however, the plaintiff filed for a divorce, which subsequently became final.

Not until January 1978 did the plaintiff discover that only the 822 shares of Badger Meter stock remained in her Smith Barney account. Since the change of the account's address, the plaintiff had not been receiving any statements regarding her account. Her husband periodically provided her with summaries of her account, but these summaries showed the account as having an equity in excess of $100,000. Similarly, in an undated financial declaration completed in connection with the divorce proceeding commenced in the spring of 1977, George Henricksen listed the value of the plaintiff's securities as $114,000. On each of these occasions, the equity in the account was considerably lower than the amount George Henricksen stated.

Mrs. Henricksen testified that she knew nothing about the cash withdrawals and never received the proceeds of the cashed checks. Leonard Walsh had dinner with the plaintiff and George Henricksen in February 1977, but the account was not mentioned. What evidently caused the plaintiff to inquire about her Smith Barney account was her discovery in January 1978 that George Henricksen had refinanced the mortgage on the home where only the plaintiff was then living. The plaintiff commenced this action on April 3, 1978.

## II. LIABILITY OF GEORGE HENRICKSEN

■ For purposes of clarity, I will analyze the potential liability of each defendant within the four categories of losses sustained by the plaintiff: cash withdrawals, trading losses, commissions and interest. There is substantial evidence in the record to warrant the inference that George Henricksen converted to his personal use the large amount of cash ($55,356.91) withdrawn from the plaintiff's account during the period in question. Smith Barney's records indicate that this amount was withdrawn from the account during 1976 and 1977. (Exhibit 13). The plaintiff testified that she was totally unaware that this cash had been taken from her account. Of the eighteen checks which were issued, the last seventeen were delivered directly to Mr. Henricksen at his office. The first check was apparently delivered to the couple's home address, but the plaintiff testified that even before the change of the account's mailing address, her husband handled all mail received from Smith Barney. Although the plaintiff testified that she never saw any of the checks, each of the seventeen checks delivered to George Henricksen bears a likeness of her signature. Finally, Richard Vermillion testified that Mr. Henricksen told him that the checks were being deposited into the couple's joint savings accounts; however, the records of the savings account indicate that only $43,825.57 reached the account, leaving $11,531.34 totally unaccounted for.

■ At trial, when questioned about the large cash withdrawals and the fate of the checks, George Henricksen invoked the fifth amendment privilege against self-incrimination; indeed, he responded in this fashion to all questions. It is now clearly established "that the Fifth Amendment does not forbid adverse inferences against

parties to civil actions when they refuse to testify in response to probative evidence offered against them. . . ." *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976). The Wisconsin supreme court has articulated the following reasons for permitting the drawing of such an inference:

"This court in *Grognet v. Fox Valley Trucking Service* (1969), 45 Wis.2d 235, 172 N.W.2d 812, stated it had long been recognized in Wisconsin that a person may invoke the fifth amendment in a civil case in order to protect himself from the use of such evidence against him in a subsequent criminal action; but if he did so, an inference against his interest might be drawn. Since the inference is irresistible and logical in such circumstances, the court may as a matter of law draw the inference. Such an inference is based upon an implied admission that a truthful answer would tend to prove that the witness had committed the criminal act or might constitute a criminal act. . . . The administration of justice and the search for truth demands that an inference may be drawn that a witness' testimony would be unfavorable to him in a civil action in which the privilege is invoked to protect himself from a subsequent criminal action." *Molloy v. Molloy,* 46 Wis.2d 682, 687–88, 176 N.W.2d 292, 296 (1970).

These cases are to be distinguished from the line of cases in which the United States Supreme Court disapproved of state attempts "to compel testimony that had not been immunized" by threatening to impose immediate sanctions upon persons refusing to waive their fifth amendment privilege. *Lefkowitz v. Turley,* 414 U.S. 70, 82, 94 S.Ct. 316, 325, 38 L.Ed.2d 274 (1973). *See also Lefkowitz v. Cunningham,* 431 U.S. 801, 808 n. 5, 97 S.Ct. 2132, 2137 n. 5, 53 L.Ed.2d 1 (1977); *Sanitation Men v. Sanitation Comm'r,* 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d 1089 (1968); *Gardner v. Broderick,* 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968); *Garrity v. New Jersey,* 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967).

Of course, as I suggested during the trial, Mr. Henricksen's silence should be "given no more evidentiary value than [is] warranted by the facts surrounding [t]his case." *Baxter v. Palmigiano, supra,* 425 U.S. at 318, 96 S.Ct. at 1558. Even according only slight weight to George Henricksen's invocation of the privilege, in light of the testimony summarized above and under all the circumstances of this case, his silence in the face of probative evidence admitted against him supports my conclusion that he did in fact, for his own purposes, dispose of the cash withdrawn from the plaintiff's account. Since the power of attorney the plaintiff gave George Henricksen in 1975 did not authorize the latter "to dispose of the assets for his own purposes," and "[i]nasmuch as the agent herein has failed to account for his principal's funds, he is liable for conversion." *Alexopoulos v. Dakouras,* 48 Wis.2d 32, 41, 179 N.W.2d 836, 840 (1971).

■ This conversion of the plaintiff's funds, which was accomplished pursuant to a scheme to defraud the plaintiff "in connection with the purchase or sale" of securities, also constitutes a violation of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j, and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.-10b–5. *See* 1 A. Bromberg, Securities Law: Fraud § 5.4, at 99 & n. 33 (citing cases). For this illegality the defendant George Henricksen is liable to the plaintiff in the amount of $55,356.91.

■ George Henricksen is also liable to the plaintiff for the losses the account sustained as a result of his purchases of calls. The evidence clearly shows that these transactions were inconsistent with the plaintiff's investment objectives and that George Henricksen knew this to be true. When the plaintiff opened her Smith Barney account, her investment objective was listed as "long term growth of capital—income secondary." Although the plaintiff did execute an option agreement with Smith Barney, both the option client information sheet and the option client approval sheet indicate that the only type of option transaction autho-

rized for the plaintiff's account was "covered writing;" "purchasing calls" was not checked on either form. Moreover, the plaintiff testified that she and her husband understood that the funds in her Smith Barney account were to be conserved for the benefit of their daughter; George Henricksen knew that this goal was seriously jeopardized by his speculative trading in call options.

■ The 1975 power of attorney does not exonerate Mr. Henricksen from liability for these trading losses. Rather, by virtue of the execution of that document, and as an incident of the broker-customer relationship, George Henricksen owed a fiduciary duty to the plaintiff. *See Schweiger v. Loewi & Co., Inc.,* 65 Wis.2d 56, 65, 221 N.W.2d 882 (1974). As a fiduciary, Mr. Henricksen was duty-bound to disclose all facts relevant to the terms of the agency, which he failed to do, and to act strictly in accordance with his principal's wishes and interests. His purchases of calls were adverse to the plaintiff's clearly-expressed interests and therefore constitute a breach of his fiduciary duty. *See Bank of California v. Hoffmann,* 255 Wis. 165, 171–171a, 38 N.W.2d 506 (1949); *Faultersack v. Clintonville Sales Corp.,* 253 Wis. 432, 437, 34 N.W.2d 682 (1948).

■ I need not decide whether, assuming George Henricksen's investments in unsuitable securities violated Rule 405 of the New York Stock Exchange and Article III, § 2, of the rules of the National Association of Securities Dealers, this constitutes a violation of the anti-fraud provisions of the federal securities laws. I find that, independent of those rules, Mr. Henricksen's purchases of calls were part of a scheme to defraud the plaintiff within the meaning of 15 U.S.C. § 78j and Rule 10b–5. George Henricksen's speculative trading in calls coincided with his large, unauthorized cash withdrawals from the plaintiff's account. I believe that these risky but potentially very profitable transactions were undertaken in order to offset and to conceal the sizeable cash withdrawals. Thus, Mr. Henricksen's fraudulent scheme to conceal his unlawful

conversion of the plaintiff's assets embraced a series of unsuitable investments in call options; for the losses resulting from this undisclosed, reckless course of conduct, George Henricksen is liable to the plaintiff in the amount of $33,564.31. *See Wright v. Heizer Corp.,* 560 F.2d 236, 251–52 (7th Cir. 1977).

Turning now to the commissions the plaintiff paid on transactions in her account during 1976 and 1977, I believe these commissions were incurred as a proximate result of George Henricksen's fraudulent acts. In order to withdraw cash from the plaintiff's account, Mr. Henricksen first had to sell securities; these sales produced commissions which were charged to the account. Goeorge Henricksen's unsuitable investments in call options also generated a substantial volume of commissions.

I do not think it would be useful or helpful for me to attempt to apply the "churning" label to Mr. Henricksen's excessive trading in calls during the latter part of 1976 and the first half of 1977. That term is normally applied to excessive trading undertaken by a broker for the sole improper purpose of generating commissions, regardless of and contrary to the customer's interests. In such a case, the broker's wrongful purpose of lining his own pockets is the cause of his customer's damages. *See Fey v. Walston & Co., Inc.,* 493 F.2d 1036, 1040 n. 1 (7th Cir. 1974); *Van Alen v. Dominick & Dominick, Inc.,* 441 F.Supp. 389, 400 (S.D.N.Y.1976), *aff'd,* 560 F.2d 547 (2d Cir. 1977).

■ In this case, however, the purpose behind George Henricksen's excessive trading in calls was not to generate commissions, as the record shows that commissions on his wife's account represented only 7.8% of his total commissions, but rather his purpose was to conceal his unauthorized cash withdrawals by reaping potentially large profits on risky investments. Thus, whether the technical churning formula does or does not fit the facts of this case, it is clear that the commissions charged on George Henricksen's purchases of calls were proximately caused by his scheme to conceal his

simultaneous defalcations. Under both the common law of fiduciary duty and the federal securities laws, he is liable to the plaintiff for the commissions charged. *See Fey v. Walston & Co., Inc., supra,* 493 F.2d at 1054–55.

■ I believe the amount of commissions for which Mr. Henricksen is liable is the total sum charged during 1976 and 1977; it is over this period that his fraudulent scheme was perpetrated. Although some of the transactions in the plaintiff's account during this period arguably were not unsuitable or were otherwise unrelated to Mr. Henricksen's fraudulent acts,

> "[i]t is now elementary that when precise damage measurements are precluded by wrongful acts, the wrongdoer cannot insist upon exact measurements and the precise tracing of causal lines to an impractical extent; fair approximations are in order." *Fey v. Walston & Co., Inc., supra,* 493 F.2d at 1055.

In this case it would be impossible to sort the lawful from the unlawful transactions because the classification depends upon Mr. Henricksen's state of mind when any particular transaction was initiated. Therefore, I hold that George Henricksen is liable to the plaintiff in the amount of $17,872.24, the total commissions charged during 1976 and 1977.

■ In my opinion, these principles also apply to the interest charged against the plaintiff's account. If George Henricksen had not been withdrawing cash from the account, purchases on margin would not have been necessary. While it is conceivable that some of the loans were contemplated by the plaintiff, particularly since she did in fact sign a margin contract after her husband explained it to her, fair approximations of damages are again appropriate here, because the same impossible task of classifying lawful and unlawful margin transactions would have to be performed. Accordingly, George Henricksen is also liable to the plaintiff for $3,882.41.

■ In addition to the damages the plaintiff may recover from George Henrick-

sen in this case, I believe the plaintiff is entitled to recover prejudgment interest. "[T]he general rule [is that] prejudgment interest is available as a matter of law on a claim which is liquidable, or fixed and determinate." *Murray v. Holiday Rambler, Inc.,* 83 Wis.2d 406, 439, 265 N.W.2d 513, 529 (1978). The court of appeals for the seventh circuit, has held that the amount upon which prejudgment interest is to be computed must be ascertainable with reasonable certainty. *Fattore Co. v. Metropolitan Sewerage Comm'n,* 505 F.2d 1, 7 (7th Cir. 1974).

The legal rate of interest in Wisconsin is five percent. § 138.04, Wis.Stats. The period for computing such interest should commence on November 1, 1977. In my opinion, recovery of this combined sum—damages plus prejudgment interest—will fairly compensate the plaintiff for the financial loss caused by her ex-husband. Moreover, this sum closely approximates the fair market value her account would have had at the time of trial had it still contained the securities held in January 1976. *See Fey v. Walston & Co., Inc., supra,* 493 F.2d at 1054–55 n. 26.

### III. LIABILITY OF SMITH BARNEY

The plaintiff has advanced two theories for holding Smith Barney liable for her entire losses in this case: (1) derivative liability based on the common law principle of respondeat superior; and (2) derivative liability based on section 20(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78t(a). In addition, the plaintiff contends that Smith Barney is liable for the losses the account sustained as a result of George Henricksen's unsuitable investments in call options based on a violation of the "know your customer" rule of the New York Stock Exchange and the National Association of Securities Dealers.

■ An investor may recover from a broker for damages caused by the fraudulent acts of the broker's registered representative under the principle of respondeat superior. *Fey v. Walston & Co., Inc., supra,* 493 F.2d at 1052–53. Here, George Hen-

ricksen defrauded the plaintiff, and, normally, as George Henricksen's employer, Smith Barney would be liable for any damages caused by the fraud. *Id.* However, George Henricksen was not only Smith Barney's agent, but, by virtue of the 1972 and 1975 powers of attorney, he was also the plaintiff's agent. This dual agency relation complicates the outcome, for, under the following authorities, George Henricksen's fraud may just as easily be imputed to the plaintiff as it may be imputed to Smith Barney.

Although Mr. Henricksen's fraudulent acts were not within the authority granted by the powers of attorney and were adverse to the plaintiff's interests, as against third parties, section 161 of the Restatement (Second) of Agency asserts that a principal may be liable for even the unauthorized acts of its general agent. Moreover, it has long been the rule in Wisconsin "that he who has, although innocently, enabled any person to do an act which might be injurious to himself or to another innocent party, shall himself suffer the injury, rather than the innocent party who has placed confidence in him." *Kasson v. Noltner,* 43 Wis. 646, 650–51 (1878). *Accord, Bronson's Executor v. Chappell,* 79 U.S. (12 Wall.) 681, 683, 20 L.Ed. 436 (1870); *Hollingsworth v. American Finance Corp.,* 86 Wis.2d 172, 181, 271 N.W.2d 872 (1979); *Motor Castings Co. v. Milwaukee County Bank,* 254 Wis. 493, 499, 36 N.W.2d 687 (1949); *Voell v. Klein,* 184 Wis. 620, 622, 200 N.W. 364 (1924). Since an agency relation connects both the plaintiff and Smith Barney to George Henricksen's fraud, the general rule that a principal is charged with his agent's fraudulent acts operates as a double-edged sword in this case, and the problem cannot be resolved by simple resort to it.

In my opinion, two other venerable common law principles furnish needed guidance for resolving the issue of Smith Barney's liability under the general law. The first of these is that, as between two parties who are otherwise similarly situated, the one who was in a better position to prevent the wrong should suffer any resultant loss. *See generally* Posner, 2 J. of Legal Studies 399 (1973). The second principle is that, notwithstanding one party's greater relative capacity to prevent the wrong, neither party should profit at the other's expense as a result of wrongs committed by a third person. Applying these principles to the facts of this case, I hold that the common law liability of Smith Barney extends to the commissions and interest charged to the plaintiff's account but not to the losses attributable to George Henricksen's unauthorized withdrawals and unsuitable investments in call options.

With regard to Mr. Henricksen's option purchases, Smith Barney was certainly entitled to believe that the plaintiff's husband was merely translating the plaintiff's wishes. Not only had she executed a power of attorney granting her husband broad discretionary authority over her account and expressly ratifying all acts he might perform as her attorney-in-fact, but she also had signed an option agreement which stated that she understood and accepted the inherent risks attending all option transactions. With regard to George Henricksen's conversion of the plaintiff's assets, it appears that the first check Mr. Henricksen converted was delivered to the couple's home address; Smith Barney cannot be liable for the amount of this check in any circumstances. As to the other seventeen checks, the testimony showed that Smith Barney's local managers questioned George Henricksen about the reasons behind both the change of address on the account and his cash withdrawals. However, there is no evidence that the plaintiff ever asked her husband why, beginning in February 1976, she was no longer receiving any records on her account; in fact, the plaintiff testified that she never bothered with the records Smith Barney sent her every month before that date.

The plaintiff places great emphasis on the fact that Smith Barney's local managers knew during 1976 and 1977 that George Henricksen was involved in drinking and gambling and was experiencing se-

rious marital problems. However, these negative factors of her husband's personal life must also have been known to the plaintiff. Yet, even after the couple separated in October 1976, and after the plaintiff filed for divorce in the spring of 1977, she failed to take any steps either to revoke the power of attorney or to have the records of her account mailed to her directly.

I am mindful that in accomplishing his fraudulent scheme George Henricksen utilized Smith Barney's facilities. However, courts should allocate liability in ways which encourage persons to be as responsible for their own affairs as the situation permits and requires. In the circumstances of this case, I find that the plaintiff could easily have prevented or at least quickly detected her husband's fraud by taking reasonable precautionary steps which the facts known to her required. Accordingly, I believe it would be unfair to hold Smith Barney responsible for losses which stemmed in part from the plaintiff's total failure to be concerned about her own financial affairs.

 On the other hand, I believe it would be equally unfair to permit Smith Barney to retain any benefits it received as a result of George Henricksen's fraudulent course of conduct. Courts have long been alert to force principals to disgorge the fruits of their agents' wrongful acts. *See generally Stockwell v. United States*, 80 U.S. (13 Wall.) 531, 548, 20 L.Ed. 491 (1871); *Amen v. Black*, 234 F.2d 12, 20–21 (10th Cir. 1956) (en banc); *Estes v. Crosby*, 171 Wis. 73, 79, 175 N.W. 933 (1920). This type of recovery "is not aimed at compensating the plaintiff, but at forcing the defendant to disgorge benefits that it would be unjust for him to keep." D. Dobbs, Remedies § 41, at 224 (1973). Though Smith Barney may protest that it innocently acquired the benefits it received in this case and should therefore be permitted to retain them, even apart from the agency relationship between it and George Henricksen, the rule is that "restitution is generally awarded when the defendant has gained a benefit that it would be unjust for him to keep, though he gained it honestly." *Id.*

As I have previously discussed, the commissions and interest which were charged against the plaintiff's account must be treated as incidents of George Henricksen's fraudulent behavior. In perpetrating the fraud, Mr. Henricksen utilized both his position with Smith Barney and the latter's facilities and instrumentalities. While the general law does not oblige Smith Barney to compensate the plaintiff for her losses, I hold that it does require Smith Barney to return to her the commissions and interest Smith Barney received as a result of George Henricksen's unlawful conduct.

 The plaintiff is also entitled to recover prejudgment interest from Smith Barney, because the latter benefited from the *use* of the sums it received. The defendants will be jointly and severally liable for the sum of the commissions, interest, and prejudgment interest, but, since George Henricksen acted as Smith Barney's agent and was the wrongdoer, Smith Barney is entitled to indemnity from him for any amount it pays to the plaintiff. *See Culver v. Webb*, 244 Wis. 478, 491, 12 N.W.2d 731 (1944). *Cf. Heizer Corp. v. Ross*, 601 F.2d 330 (7th Cir. 1979) (indemnity not allowed where all defendants are wrongdoers).

Application of these general principles does not dispose of Smith Barney's potential liability under the federal securities laws. The relevant statute, 15 U.S.C. § 78t(a), provides that:

"Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."

The court of appeals for this circuit has interpreted this provision to mean that persons in control shall be liable if they "did not maintain a reasonably adequate system of internal supervision and control . . . or did not enforce with any reasonable dili-

gence such system . . . ." *Fey v. Walston & Co., Inc., supra,* 493 F.2d at 1051. The question is whether Smith Barney is liable under this statute for the plaintiff's losses due to George Henricksen's unauthorized cash withdrawals and option transactions.

Upon careful consideration of all the relevant facts, I am satisfied that George Henricksen's unlawful conversion of the plaintiff's funds was not due to any failure on Smith Barney's part to enforce with reasonable diligence its internal plan of supervision. Though the plaintiff contends that the change of address on the account enabled George Henricksen to convert her assets, the record shows that the first check Mr. Henricksen converted was delivered to the couple's home address. In fact, according to the plaintiff's own testimony, she would not have discovered the continuing thefts even if the address on the account had not been changed because she did not concern herself with mail from Smith Barney but left such matters to her husband.

Assuming the change of address did facilitate George Henricksen's defalcations, I believe Smith Barney was not guilty of an unreasonable lack of diligence. Rather, both its local managers questioned Mr. Henricksen about the change of address and received plausible explanations as to the reasons behind both the change of address and the cash withdrawals. Moreover, rule 409(b)(2) of the New York Stock Exchange expressly permits a registered representative to receive his wife's mail over whose account he holds a power of attorney. It should be remembered that the checks themselves were made out to Wendee Henricksen, and only by placing her endorsement onto the checks was George Henricksen able to cash them; certainly Smith Barney had no more control over this circumstance than it had over the ease with which George Henricksen was able to deposit a large portion of the checks into the couple's joint savings account and shortly thereafter withdraw such amounts without being discovered by the plaintiff.

With the benefit of hindsight, the plaintiff argues that Smith Barney's local managers should have drawn a connection between the large, continuous cash withdrawals and George Henricksen's personal problems, including the couple's separation. Awareness of these same problems did not trigger similar concern on the plaintiff's part which itself suggests that Smith Barney's supervision of Mr. Henricksen was not unreasonable or inadequate. On the contrary, I find that Smith Barney discharged its duty to supervise with reasonable diligence George Henricksen's withdrawals of cash from the plaintiff's account and therefore hold that Smith Barney is not jointly and severally liable for Mr. Henricksen's fraudulent conversion of the plaintiff's funds.

I also find that, considering all the circumstances, Smith Barney was reasonably diligent in its supervision of the quality of trading in the plaintiff's account. The plaintiff's investment objectives were relatively conservative when she opened the account in 1972, and, even after she signed an option agreement in 1975, the account retained a generally conservative quality. However, in light of the sweeping terms of the power of attorney the plaintiff executed in favor of George Henricksen, it is clear to me that he was given the power to make whatever investments he deemed suitable for the plaintiff's account. Thus, in discharging its duty to supervise with reasonable diligence Mr. Henricksen's actions, Smith Barney was entitled to rely on George Henricksen's investment decisions just as the plaintiff relied on her husband's expertise.

This approach finds support in *Ocrant v. Dean Witter & Company, Inc.,* 502 F.2d 854 (10th Cir. 1974), and *Marshak v. Blyth Eastman Dillon & Co., Inc.,* 413 F.Supp. 377 (N.D.Okl.1975). In *Ocrant,* the court found an apparent agency relationship between the plaintiff wife and her husband and that the plaintiff relied exclusively on her husband to handle her investment account. What the court said in *Ocrant* is germane here:

"Throughout this action [the plaintiff] has stressed her complete reliance on her husband's skill and expertise to excuse her own inattentiveness and inaction. She cannot now reject that reliance for purposes of disaffirming his activities." 502 F.2d at 858.

The *Marshak* court similarly held that, after relying on the manner in which her husband handled her account, the plaintiff could not disavow his control simply because problems subsequently arose. 413 F.Supp. at 381–83.

Of course, in this case, unlike *Ocrant* and *Marshak*, the husband upon whom the plaintiff relied was employed by the defendant broker, and the latter was duty-bound to supervise the husband's activities. I do not suggest that, by virtue of the agency relation, George Henricksen's knowledge must be imputed to the plaintiff, thereby estopping her from challenging the uncontroverted option transactions. I do believe, however, that the reasonableness of Smith Barney's supervision of George Henricksen must be evaluated in light of the express agency relationship which existed between Mr. Henrickson and the plaintiff and in light of Mr. Henricksen's investment experience.

Smith Barney's local managers, because they approved of each of Mr. Henricksen's orders, knew that the account was trading heavily in options. However, they also believed that George Henricksen was mitigating the impact of this trading by sheltering large amounts of cash in a savings account. On the one occasion when Mr. Henricksen clearly exceeded the account's approved level of trading by making an "uncovered" transaction, Smith Barney's compliance section required him to cover the transaction.

█ That the plaintiff's account incurred substantial losses as a result of options trading does not alone make Smith Barney's supervision unreasonable or indicate a lack of diligence. Rather, based on all the facts known to Smith Barney, including the power of attorney, the option agreement, George Henricksen's investment experience and his reported placing of large amounts of cash in a safe harbor, I am satisfied that the plaintiff's losses in options trading were not due to a failure on Smith Barney's part to supervise George Henricksen with reasonable diligence.

█ I also conclude that Smith Barney is not liable for the plaintiff's trading losses based on an alleged violation of the New York Stock Exchange's "know your customer" rule. In *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135, 143 (7th Cir.), *cert. denied*, 396 U.S. 838, 90 S.Ct. 98, 24 L.Ed.2d 88 (1969), the court held that a violation of this rule would constitute a violation of federal law in certain circumstances but that "mere errors of judgment by defendant might not support a federal cause of action . . . ." In this case, Smith Barney's customer had given her broker-husband wide discretionary authority over her account, expressly ratifying whatever acts he might perform. She had also signed an option agreement and a margin contract. In these circumstances, Smith Barney was entitled to believe that George Henricksen was executing his wife's wishes. While this belief can be described as an error of judgment, in my opinion this error affords an insufficient basis upon which to base liability against Smith Barney.

## CONCLUSION

Therefore, IT IS ORDERED that the plaintiff recover from the defendant George Henricksen the sum of $88,921.22, plus prejudgment interest on such sum computed at the rate of 5% per annum since November 1, 1977, plus the plaintiff's costs in this action.

IT IS ALSO ORDERED that the plaintiff recover from both defendants jointly and severally the sum of $21,754.65, plus prejudgment interest on such sum computed at the rate of 5% per annum since November 1, 1977.

IT IS FURTHER ORDERED that the defendant Smith, Barney, Harris, Upham & Co., Inc. may recover from the defendant George Henricksen any sum it pays to the plaintiff as a result of the above order.

IT IS FURTHER ORDERED that no costs be recovered from the defendant Smith, Barney, Harris, Upham & Co., Inc.